No. 24-1726

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

GREG HALE, et al.

*Plaintiffs-Appellees*,

vs.

ARCARE, INC.

*Defendant-Appellant.*

*On Appeal from the United States District Court*
*For the Eastern District of Arkansas, No. 22-cv-00117, Hon. Brian S. Miller*

## <u>APPELLANT'S OPENING BRIEF</u>

Matthew Sidney Freedus
Rosie Dawn Griffin
**FELDESMAN LEIFER LLP**
1129 20th Street N.W., Suite 400
Washington, DC 20036
202.466.8960
202.293.8103 (fax)
mfreedus@feldesman.com
rgriffin@feldesman.com

Scott A. Irby
Gary D. Marts, Jr.
**WRIGHT, LINDSEY & JENNINGS LLP**
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
501.371.0808
501.376.9442 (fax)
sirby@wlj.com
gmarts@wlj.com

*Counsel for Defendant-Appellant ARcare, Inc.*

**SUMMARY OF THE CASE AND ORAL ARGUMENT REQUEST**

At issue is whether Defendant-Appellant ARcare, Inc. ("ARcare")—a community health center funded under the Public Health Service (PHS) Act and "deemed" to be a PHS employee under 42 U.S.C. § 233(g)—can claim the benefit § 233(a) of that Act, which "grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct." *Hui v. Castaneda*, 559 U.S. 799, 806 (2010); 42 U.S.C. § 233(a) (effectuating immunity by making claim against United States under Federal Tort Claims Act exclusive remedy). The issue is of first impression in this Circuit.

Plaintiffs' putative class action alleges ARcare inadequately protected the confidentiality of its patients' health information, thereby causing its unauthorized disclosure to third parties. Citing § 233(a), ARcare moved to substitute the United States in its place. The district court denied the motion, ruling that § 233(a) immunizes only acts and omissions occurring during patient treatment. Such an interpretation renders superfluous, among other statutory language, the Act's explicit coverage of "related" functions, and unduly limits the protection it affords to federally-supported health centers participating in a nationwide health care program serving medically underserved populations and geographic areas.

Oral argument with twenty minutes per side is warranted.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. Rule App. P. 26.1, undersigned counsel for Appellant ARcare, Inc. makes the following disclosure: ARcare, Inc. has no parent corporation and no stock, publicly held or otherwise.

s/ *Matthew Sidney Freedus*
Matthew Sidney Freedus

*Counsel for Defendant-Appellant*
*ARcare, Inc.*

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND ORAL ARGUMENT REQUEST ................... ii

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF CONTENTS ........................................................ iv

TABLE OF AUTHORITIES ..................................................... vi

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 1

STATEMENT OF THE CASE ..................................................... 3

   I. Legal Framework ................................................... 3

   II. Factual and Procedural Background ................................. 8

STANDARD OF REVIEW ....................................................... 15

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 16

ARGUMENT ................................................................. 18

   I. The Absolute Immunity At Issue Covers *Any* Action Or Proceeding
      Resulting From The Performance Of Medical Or Related Functions
      Within The Scope Of Official Employment ............................ 18

      A. The Scope Of § 233(a) Immunity Is Entirely Separate From The
         Scope Of The FTCA's Remedy ................................... 20

      B. There Is No Textual Basis For The District Court's Limitation Of
         § 233(a) Immunity To Acts And Omissions Occurring During Medical
         Treatment ...................................................... 23

    C.  Related Functions Within The Meaning Of § 233(a) Include Those
        Intertwined With Medical Care ................................................................ 29

II.  Plaintiffs' Claims Result From ARcare's Performance Of Medical And
    Related Functions ......................................................................................... 36

    A.  The Obligation To Protect The Confidentiality Of Patient
        Information Has Long Been Interwoven With Medical Care ................. 37

    B.  ARcare's Legal Obligations To Safeguard Patient Confidentiality
        Underscore The Medical Or Medically-Related Nature Of Its Alleged
        Acts And Omissions ............................................................................. 43

    C.  The District Court Erred In Distinguishing Apposite Decisions ............. 48

CONCLUSION ....................................................................................................... 50

CERTIFICATE OF COMPLIANCE ...................................................................... 52

CERTIFICATE OF SERVICE ............................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agyin v. Razmzan,*
986 F.3d 168 (2d Cir. 2021) ..........................................................*passim*

*Alternate Fuels, Inc. v. Cabanas,*
435 F.3d 855 (8th Cir. 2006) ...............................................................15

*Am. Nat'l Property and Cas. Co. v. Julie R.,*
76 Cal. App. 4th 134 (1999) ................................................................28

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
548 U.S. 291 (2006)..............................................................................29

*Barcomb v. Gen. Motors LLC,*
978 F.3d 545 (8th Cir. 2020) ...............................................................31

*Bennett v. United States,*
375 F. Supp. 3d 1180 (W.D. Wash. 2019) ....................................34, 35

*Brignac v. United States,*
239 F. Supp. 3d 1367 (N.D. Ga. 2017)..........................................32, 35

*Briseno v. Fam. Health Ctr.,*
No. 05-cv-4344, 2005 WL 3242058 (W.D. Mo. Nov. 30, 2005)........23

*C.K. v. United States,*
No. 19-cv-2492 TWR (RBB), 2020 WL 6684921 (S.D. Cal. Nov.
12, 2020) ..............................................................................................35

*Carton v. Gen. Motor Acceptance Corp.,*
611 F.3d 451 (8th Cir. 2010) ...............................................................30

*Cmty. Health Care Ass'n of N.Y. v. Shah,*
770 F.3d 129 (2d Cir. 2014) ..................................................................3

*Cuoco v. Moritsugu,*
222 F.3d 99 (2d Cir. 2000) .......................................................18, 22, 24

*Dan's City Used Cars, Inc. v. Pelkey*,
    569 U.S. 251 (2013)..................................................................................31

*Daniels v. Lutz*,
    407 F. Supp. 2d 1038 (E.D. Ark. 2005)............................................17

*De La Cruz v. Graber*,
    No. 16-cv-1294, 2017 WL 4277129 (C.D. Cal. June 15, 2017) ......................33

*Doe v. Neighborhood Healthcare*,
    No. 21-cv-1587, 2022 WL 17663520 (S.D. Cal. Sept. 8, 2022) ..............3, 18, 48

*Est. of Campbell v. S. Jersey Med. Ctr.*,
    732 F. App'x 113 (3d Cir. 2018) ..........................................................7

*FDIC v. Meyer*,
    510 U.S. 471 (1994)..............................................................................27, 29

*Ford v. Sandhills Med. Found., Inc.*,
    97 F.4th 252 (4th Cir. 2024) ......................................................34, 48

*Friedenberg v. Lane County*,
    68 F.4th 1113 (9th Cir. 2023) ..................................................*passim*

*Hui v. Castaneda*,
    559 U.S. 799 (2010)..................................................................*passim*

*Hunter v. Bryant*,
    502 U.S. 224 (1991)....................................................................6

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988)....................................................................24

*Kezer v. Penobscot Cmty. Health Ctr.*,
    No. 15-cv-225, 2019 BL 141566 (D. Me. March 21, 2019) .................35, 39, 49

*Krandle v. Refuah Health Ctr., Inc.*,
    No. 22-cv-4977, 2024 WL 1075359 (S.D.N.Y. Mar. 12, 2024) ................*passim*

*Lowe v. SEC*,
    472 U.S. 181 (1985)..........................................................................30

vii

*M.G. v. United States,*
    No. 19-cv-1252, 2020 WL 6271186 (S.D. Cal. Oct. 23, 2020) ........................35

*Marshall v. Lamoille Health Partners, Inc.,*
    No. 22-cv-166, 2023 WL 2931823 (D. Vt. Apr. 13, 2023)................................34

*Mele v. Hill Health Ctr.,*
    No. 06-cv-00455, 2008 WL 160226 (D. Conn. Jan. 8, 2008) ....................49, 50

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985)..............................................................................1, 6

*Mohamad v. Palestinian Authority,*
    566 U.S. 449 (2012)...................................................................................29

*Motley v. United States,*
    295 F.3d 820 (8th Cir. 2002) .....................................................................23

*Piper v. United States,*
    887 F.2d 861 (8th Cir.1989) ......................................................................17

*Pomeroy v. United States,*
    No. 17-cv-10211, 2018 WL 1093501 (D. Mass. Feb. 27, 2018).................25, 34

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979)...................................................................................30

*Sanchez v. United States,*
    No. 18-cv-1550, 2019 WL 3766615 (S.D. Cal. Aug. 9, 2019) .........................35

*Smith v. United States,*
    508 U. S. 223 (1993)..................................................................................28

*State Farm Mutual Auto. Ins. Co. v. Davis,*
    937 F.2d 1415 (9th Cir. 1991) ....................................................................28

*Teresa T. v. Ragaglia,*
    154 F.Supp.2d 290 (D. Conn. 2001)............................................................32

*United States v. Butler,*
    297 U.S. 1 (1936).....................................................................................34

*United States v. I.L.*,
614 F.3d 817 (8th Cir. 2010) ..............................................36

*United States v. Smith*,
499 U.S. 160 (1991)..............................................20, 22

*Z.B. v. Ammonoosuc Cmty. Health Servs., Inc.*,
No. 03-cv-540, 2004 WL 1571988 (D. Me. June 13, 2004) .................31, 32, 35

**Statutes**

28 U.S.C. § 517...................................................................14

28 U.S.C. § 1291...................................................................1

28 U.S.C. § 1346(b)...........................................................17, 22

28 U.S.C. § 1346(b)(1)...........................................................7

28 U.S.C. § 1442...........................................................1, 12

28 U.S.C. § 1442(a)(1)...........................................................9

42 U.S.C. § 210...................................................................25

42 U.S.C. § 212(a)(4)(ii)...........................................................25

42 U.S.C. § 217b...................................................................33

42 U.S.C. § 233...............................................................*passim*

42 U.S.C. § 233(a)...............................................................*passim*

42 U.S.C. § 233(b)...........................................................11, 12

42 U.S.C. § 233(g)...........................................................5, 26

42 U.S.C. § 233(g)(1)(A)...........................................21, 26, 27

42 U.S.C. § 233(g)(1)(F)...........................................................5, 19

42 U.S.C. § 233(g)(4)...........................................................7, 45

42 U.S.C. § 233(h)(1)...........................................................46

42 U.S.C. § 233(*l*)(2) ............................................................*passim*

42 U.S.C. § 241 ..............................................................................26

42 U.S.C. § 242b ............................................................................33

42 U.S.C. § 247e ............................................................................33

42 U.S.C. § 248 ........................................................................32, 32

42 U.S.C. § 250 ..............................................................................32

42 U.S.C. § 252 ........................................................................33, 34

42 U.S.C. § 253 ..............................................................................34

42 U.S.C. § 254b ...............................................................*passim*

42 U.S.C. § 254b(a) ....................................................................3, 9

42 U.S.C. § 254b(b) ........................................................................3

42 U.S.C. § 254b(k) ........................................................................3

42 U.S.C. § 254b(k)(3)(C) ........................................................9, 45

42 U.S.C. § 254b(k)(3)(G) ..............................................................9

42 U.S.C. § 254b(k)(3)(H)(i) ........................................................27

42 U.S.C. § 264 ..............................................................................33

42 U.S.C. § 266 ..............................................................................33

42 U.S.C. § 1320d-1 ......................................................................10

42 U.S.C. § 1320d-2(d)(2)(A) ......................................................43

42 U.S.C. § 1320d-2(d)(2)(B) ......................................................43

Act of July 28, 1955, c. 417, § 3, 69 Stat. 382 ............................33

Ark. Code § 16-114-201(1) ..........................................................24

Emergency Health Personnel Act of 1970, Pub. L. No. 91-623 ......3, 4, 21

Federally Supported Health Centers Assistance Act of 1992, Pub. L.
No. 102-501 ......................................................................................4

Pub. L. No. 104-73 ...............................................................................5

Public Health Service Act, c. 373, 58 Stat. 682 (1944) ....................25, 32

**Regulations**

42 C.F.R. § 6.6(c) ...............................................................................7

42 C.F.R. § 6.6(d) ...............................................................................7

42 C.F.R. § 51c.110 .......................................................................10, 47

42 C.F.R. § 51c.303 .......................................................................10, 47

45 C.F.R. § 164.306(a)(2) ....................................................................45

45 C.F.R. § 164.306(a)(3) ....................................................................45

45 C.F.R. § 164.500 ............................................................................44

45 C.F.R. § 164.530(c)(1) ....................................................................44

45 C.F.R. § 164.530(c)(2) ....................................................................44

45 C.F.R. § 164.534 ............................................................................44

65 Fed. Reg. 82,462 (Dec. 28, 2000) ................................................*passim*

68 Fed. Reg. 8,334 (Feb. 20, 2003) .......................................................40

**Legislative Materials**

141 Cong. Rec. H14273 .....................................................................5, 8

H.R. Rep. No. 102-823 (1992) ................................................................9

H.R. Rep. No. 104-398 (1995) .........................................................*passim*

**Other Authorities**

Alfred W. Childs, *The Functions of Medical Care*, Pub. Health Rep.
  10 (1975),
  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1434713/pdf/pubh
  ealthrep00162-0012.pdf .......................................................................31

American Medical Association, Code of Ethics § 3.1.1, *Privacy in
  Health Care*, https://code-medical-ethics.amaassn.org/ethics-
  opinions/privacy-health-care ............................................................38

American Medical Association, Code of Ethics § 3.3.2,
  *Confidentiality & Electronic Medical Records*, https://code-
  medicalethics. ama-assn.org/ethics-opinions/confidentiality-
  electronic-medical-records..................................................................38

American Medical Association, Opinion 3.2.1: *Confidentiality*,
  https://code-medical-ethics.ama-
  assn.org/ethicsopinions/confidentiality .............................................39

American Medical Association, Opinion 3.2.4: *Access to Medical
  Records by Data Collection Companies*, https://code-
  medicalethics. ama-assn.org/ethics-opinions/access-medical-
  records-data-collectioncompanies .....................................................39

*Arise*, Ballentine's Law Dictionary (3d ed. 1969).................................28

*Arise*, Black's Law Dictionary (11th ed. 2019).....................................28

Centers for Medicare and Medicaid Services, *Security 101 for
  Covered Entities* (rev. Mar. 2007), https://bit.ly/4eG4vKF ...............40

*Consequence*, Ballentine's Law Dictionary (3d ed. 1969)......................28

Edelstein, *The Hippocratic Oath: Text, Translation, and
  Interpretation* (1943) ........................................................................37

HHS, Health Resources and Services Administration, Calendar Year
  2022 Requirements for Coverage for Health Centers and Their
  Covered Individuals, https://bit.ly/3xFfinH.......................................46

HHS, Health Resources and Services Administration, Health Center Compliance Manual, Ch. 10: Quality Improvement/Assurance, https://bit.ly/3VLlJxr ............................................................47

HHS News, *HHS Announces Next Steps in Ongoing Work to Enhance Cybersecurity for Health Care and Public Sectors* (Dec. 6, 2023), https://bit.ly/3I4xOaC/ ..................................................42

HHS, Office of the National Coordinator for Health Information Technology, *Guide to Privacy and Security of Electronic Health Information*, Ch. 1, https://bit.ly/3W3qkwg ......................................41

Institute of Medicine, Committee on Health Research and the Privacy of Health Information, *Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research* 86 (2009), https://www.ncbi.nlm.nih.gov/books/NBK9579/ ...........................38, 42

*Function*, Black's Law Dictionary (11th ed. 2019) .................................30

*Malpractice*, Black's Law Dictionary (11th ed. 2019)............................24

*Medical,* Oxford English Dictionary (2d Ed. 1961) ...............................30

*Medicine*, Oxford English Dictionary (2d Ed. 1989) .............................30

*Related*, Black's Law Dictionary (Rev. 4th ed. 1968).........................31

*Related*, Oxford English Dictionary (3d Ed. Dec. 2009).......................31

*Result*, Ballentine's Law Dictionary (3d ed. 1969) ...............................28

*Result*, Black's Law Dictionary (11th ed. 2019) ....................................28

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Arkansas had jurisdiction over this consolidated putative class action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2); over two cases filed in state court and subsequently removed to the Eastern District and consolidated with this action—*Engles*, No. 22-cv-00139 and *Whitkanack*, No. 22-cv-00140—the district court additionally had removal jurisdiction under 28 U.S.C. § 1442 and 42 U.S.C. § 233(*l*)(2). On April 5, 2024, ARcare timely noticed this appeal from the district court's March 8, 2024 denial of its motion to substitute the United States in its place pursuant to 42 U.S.C. § 233(a). App. 143–49, Add. 1–7, R. Doc. 39 at 1–7.

This Court has appellate jurisdiction under 28 U.S.C. § 1291. *See Hui v. Castaneda*, 559 U.S. 799, 804 n.4 (2010) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 524–27 (1985) ("[D]istrict court orders denying absolute immunity [under § 233(a)] constitute 'final decisions' for purposes of 28 U.S.C. § 1291.").

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in concluding that to be a "related function" within the meaning of 42 U.S.C. § 233(a), a function must "involve conduct that occurred during the course of medical treatment within the context of the provider-patient relationship." App. 148, Add. 6, R. Doc. 39 at 6.

Apposite authorities:

> 42 U.S.C. § 233 (authorizes Secretary of the U.S. Department of Health and Human Services to deem federally-funded health centers to be Public Health Service employees for purposes of official immunity from any civil action or proceeding resulting from the performance of medical or related functions within the scope of official employment);

> *Hui v. Castaneda*, 559 U.S. 799 (2010) (holding § 233(a)'s plain language bars "all actions" against PHS employees "arising out of the performance of medical or related functions," not merely those actions sounding in medical malpractice or negligence occurring during a patient encounter);

> *Friedenberg v. Lane County*, 68 F.4th 1113 (9th Cir. 2023) (rejecting premise that "alleged tort occur during the provision of services");

> *Krandle v. Refuah Health Ctr., Inc.*, No. 22-cv-4977, 2024 WL 1075359 (S.D.N.Y. Mar. 12, 2024) (rejecting reading of § 233(a) as requiring "a direct connection" between the conduct giving rise to a lawsuit and "the course of medical treatment").

2.      Whether acts and omissions in securing and protecting—or failing to

adequately secure and protect—confidential patient information constitute the

performance of a "medical . . . or related function" within the meaning of 42

U.S.C. § 233(a).

Apposite authorities:

> 42 U.S.C. 254b (authorizing federal funding to and dictating day-to-day operations of health centers, including requirements related to patient privacy and the confidentiality of patient information);

> 42 U.S.C. § 233(a) (granting immunity from "any civil action or proceeding" "resulting from the performance of medical . . . or related functions");

> *Friedenberg v. Lane County*, 68 F.4th 1113 (9th Cir. 2023) (construing "related functions" under 42 U.S.C. § 233(a));

*Krandle v. Refuah Health Ctr., Inc.*, No. 22-cv-4977, 2024 WL 1075359 (S.D.N.Y. Mar. 12, 2024) (determining "related functions" "must have a real relationship to the practice of medicine" and concluding health center's "responsibility to secure data from internal and external threats in its capacity as a deemed entity . . . is essential to the practice of medicine");

*Doe v. Neighborhood Healthcare*, No. 21-cv-1587, 2022 WL 17663520 (S.D. Cal. Sept. 8, 2022) (same).

## STATEMENT OF THE CASE

### I.     Legal Framework

Federally-funded community health centers like ARcare "occupy a unique place in the health services ecology." *Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 157 (2d Cir. 2014). Created under and governed by Section 330 of the Public Health Service (PHS) Act, *codified at* 42 U.S.C. § 254b, health centers are required by that statute to, among other things: (1) serve an area or population designated by the Secretary of the U.S. Department of Health and Human Services (HHS) to be medically underserved; (2) provide "required" primary health care and related services; and (3) serve all community residents and make all statutorily-defined "required" and "additional" services equally available to all patients, regardless of any individual's ability to pay for the services. *See* 42 U.S.C. § 254b(a), (b), (k).

Health centers are afforded certain statutory benefits to facilitate health center program goals, including the right to absolute immunity at the heart of this dispute. That immunity right is rooted in the Emergency Health Personnel Act of

3

1970, Pub. L. No. 91-623, § 4, 84 Stat. 1868, 1870–71 (1970), *codified at* 42 U.S.C. § 233, which renders PHS personnel immune from any civil action or proceeding arising out of their performance of "medical, surgical, dental, or related functions" undertaken within the scope of official employment. 42 U.S.C. § 233(a). PHS employees' suit immunity—a freedom from the burdens of both litigation and liability—is ensured by 42 U.S.C. § 233(a), which makes a claim against the United States under the Federal Tort Claims Act (FTCA) "exclusive of any other civil action or proceeding." *Id.*; *see also* Pub. L. No. 91-623 (An Act "[t]o amend the Public Health Service Act to authorize the assignment of commissioned officers of the Public Health Service to areas with critical medical manpower shortage, to encourage health personnel to practice in areas where shortages of such personnel exist, and for other purposes."). The immunity is "comprehensive," covering "both known and unknown causes of action." *Hui*, 559 U.S. at 806, 811–13 (holding § 233(a) immunity extends to *Bivens* actions).

Two decades after the enactment of § 233(a), to address "concerns about the shortage of healthcare services available to . . . medically underserved areas," Congress enacted the Federally Supported Health Centers Assistance Act ("FSHCAA") of 1992, Pub. L. No. 102-501, which extended to certain federally-supported health centers and their personnel—including not only medical providers, but also officers, all non-provider employees, and certain contractors—

4

the same protection § 233(a) has afforded actual PHS employees since the 1970s. *See* 141 Cong. Rec. H14273–77, 1995 WL 733808 (daily ed. Dec. 12, 1995) (statement of Rep. Michael Bilirakis) (FSHCAA's original purpose "was to relieve health centers of the burdensome costs of private malpractice insurance by extending Federal Tort Claims Act coverage to health center employees"); *Friedenberg v. Lane County*, 68 F.4th 1113, 1124 (9th Cir. 2023). Initially enacted as a three-year demonstration project, the FSHCAA was amended and made permanent in 1995. Pub. L. No. 104-73, *codified at* 42 U.S.C. § 233(g) *et seq.*; *see also* H.R. Rep. No. 104-398, 104th Cong., 1st Sess. (1995) at 6, 7 (1995), *reprinted in* 1995 U.S.C.C.A.N. 767, 769 (explaining during three-year demonstration period "[t]he program has yielded significant savings for participating health centers" and thereby allowed those federal and other funds to be "redirected to patient care").

The FSHCAA, as amended, immunizes health centers and their personnel by authorizing the HHS Secretary to "deem" them to be PHS employees for purposes of § 233(a) immunity. 42 U.S.C. § 233(g), (h). Such deeming is within the HHS Secretary's exclusive authority, and "[o]nce the Secretary makes a determination that an entity . . . is deemed to be an employee of the Public Health Service for purposes of [§ 233], the determination [is] . . . final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding." 42 U.S.C. § 233(g)(1)(F). Both actual and deemed PHS employees thus enjoy

§ 233(a)'s "absolute immunity . . . for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct." *Hui*, 559 U.S. at 806; H.R. Rep. No. 104-398 at 4 (indicating Congress' intent that deemed PHS employees "be covered for malpractice claims under the FTCA in the same manner as are employees of the [PHS]"); *accord Agyin v. Razmzan*, 986 F.3d 168, 177 (2d Cir. 2021); *see also Mitchell*, 472 U.S. at 525 ("the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action.").

Where a deemed PHS employee asserts immunity, the district court must resolve a two-fold inquiry: first, whether the conduct (*i.e.*, acts and/or omissions) giving rise to the civil action or proceeding resulted from the deemed defendant's "performance of medical . . . or related functions" within the meaning of § 233(a); and second, whether such conduct occurred within the scope of the defendant's deemed federal employment. The required threshold immunity determination, which is distinct from any analysis or consideration of the merits of the underlying claim, "should be made at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *cf.* Order Denying Motion to Remand, *Engles v. ARcare*, 22-cv-00139 (E.D. Ark. 2022), ECF No. 55 (acknowledging requirement of a threshold immunity determination "hearing" under 42 U.S.C. § 233(*l*)(2)).

6

Any dispute as to whether a deemed defendant was acting within the scope of its deemed federal employment is adjudicated in federal court under the "ordinary rules of evidence and procedure." *Hui*, 559 U.S. at 811; *see also Est. of Campbell v. S. Jersey Med. Ctr.*, 732 F. App'x 113, 116 (3d Cir. 2018) (recognizing availability and purpose of § 233(*l*)(2) hearing). The court's scope of employment analysis is governed by "the law of the place," *i.e.*, the law of the state in which the alleged wrong occurred. 28 U.S.C. § 1346(b)(1). Where a public or non-profit private health center entity is sued, scope of employment is a function of the health center's statutory obligations under the health center program statute, 42 U.S.C. § 254b, and the terms and conditions of the entity's HHS-approved grant project. *See* 42 U.S.C. § 233(g)(4) (requiring receipt of § 254b funding as prerequisite for deemed PHS status). Health centers and their employees act within the scope of their employment when performing medical, surgical, dental, or related functions, when performing "health and health-related functions" and providing services "to all patients" of the health center, as well as to "individuals who are not patients" but who nonetheless received health center services. *Id.* § 233(g)(1)(B)–(C), (h); *accord* 42 C.F.R. § 6.6(c), (d); *see also* H.R. Rep. No. 104-398 at 4 (reiterating coverage for claims resulting from all medical and related services provided to patients); *Agyin*, 986 F.3d at 186 ("The regulation . . . restates

the proposition that the FSHCAA provides immunity only for conduct undertaken within the scope of the defendant's employment.").

The immunity ARcare applied for and received is broadly set forth in a single statutory provision to eliminate any uncertainty that it fully replaces health centers' need for costly private professional malpractice insurance. *See Hui*, 559 U.S. at 806; 141 Cong. Rec. H14273–77, 1995 WL 733808 (daily ed. Dec. 12, 1995) (statement of Rep. Ron Wyden) ("The bill allows [community health centers]' to reallocate desperately needed health care dollars from the coffers of private medical malpractice insurance companies to direct services for hundreds thousands more poor and rural Americans."); H.R. Rep. No. 104-398, at 4, (1995), *as reprinted in* 1995 U.S.C.C.A.N. 767, 768 (stating one purpose of PHS Act is to ensure "[h]ealth centers and their employees, officers, and contractors are covered for malpractice claims in the same manner as employees of the Public Health Service who provide medical care."); *accord Friedenberg*, 68 F.4th at 1124–25. The immunity is "comprehensive" and described in "broad" language, protecting against "*any* civil action or proceeding" resulting from official conduct. *Hui*, 559 U.S. at 806.

## II. Factual And Procedural Background

Defendant-Appellant ARcare is an Arkansas nonprofit, community-based health center funded through and governed by the PHS Act, 42 U.S.C. § 254b, to

provide primary health care and related services to HHS-designated "medically underserved" populations and geographic areas, *id.* at 254b(a)(l). Established in 1986 and currently operating fifty-two clinic locations across Arkansas, Kentucky, and Mississippi, ARcare has been a multi-site community health center for almost forty years. Notice of Removal at 60–61, *Engles*, 22-cv-00139, ECF No. 1 (hereinafter "*Engles* Notice of Removal"). ARcare's patient population, like that of all health centers, is medically underserved, and ARcare provides its services—as required by federal law—regardless of any individual patient's insurance status or ability to pay for care. *Id.* at 60; 42 U.S.C. 254b(k)(3)(G).

As a federally-funded health center, ARcare is subject to detailed federal requirements, oversight, and control. *See* H.R. Rep. No. 102-823 at 5 ("Federal requirements associated with the grants are administratively burdensome and address all areas of operation."); *accord Agyin*, 986 F.3d at 177 (concluding deemed health center is "subject to federal oversight and control" sufficient to render health center physician "acting under" federal officer for purposes of 28 U.S.C. § 1442(a)(1)). Among these requirements is the obligation to "have an ongoing quality improvement system that includes clinical services and management, and that *maintains the confidentiality of patient records*." 42 U.S.C. § 254b(k)(3)(C) (emphasis added) (prohibiting HHS's approval of a health center's grant application absent a determination of compliance with this requirement); *see*

*also* 42 C.F.R. §§ 51c.110 ("*All* information as to personal facts and circumstances obtained by the project staff about recipients of services shall be held confidential, and shall not be divulged without the individual's consent. . . .") (emphasis added), 51c.303 ("A community health center supported under this subpart must . . . [i]mplement a system for maintaining the confidentiality of patient records in accordance with the requirements of § 51c.110 of subpart A."). As a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA"), ARcare is further subject to statutory and regulatory obligations to maintain and safeguard the confidentiality of patient information. *See* 42 U.S.C. §§ 1320d-1 (applying HIPAA standards to "health care provider[s] who transmit[] health information in electronic form"); 1395x(s)(E), (aa) (defining HIPAA covered health care provider to include "Federally qualified health center[s]").

For many consecutive years, ARcare has applied for and received deemed PHS employee status from HHS for itself and its employees, confirmed in annual HHS Notices of Deeming Action. *See Engles* Notice of Removal at 107–12 (HHS Notices of Deeming Action for CY 2019, 2020, and 2021). The Notices confirm coverage comparable to an "occurrence" insurance policy—*i.e.*, coverage applicable to conduct (acts or omissions) that occurred in a period for which the defendant was deemed to be a PHS employee, regardless of when a resulting claim

10

is made. *Id.* ("Deemed health centers must continue to receive funding under . . . § 254b, in order to maintain coverage as a deemed PHS employee").

Between May and June 2022, ARcare was named as the defendant in six putative class actions arising out of a March 2022 data breach; four actions were filed in the U.S. District Court for the Eastern District of Arkansas, and two— brought by named Plaintiffs Engles and Whitkanack, respectively—were filed in Arkansas state court. *See Hale v. ARcare*, No. 22-cv-117-BSM (E.D. Ark.) (filed May 10, 2022); *Engles v. ARcare*, No. 22-cv-43 (Cir. Ct. Woodruff Cnty, Ark.) (filed May 10, 2022); *White v. ARcare*, No. 22-cv-00454-KGB (E.D. Ark.) (filed May 16, 2022); *Gilmore v. ARcare*, No. 22-cv-00123 (E.D. Ark.) (filed May 19, 2022); *Whitkanack v. ARcare*, No. 22-cv-46 (Cir. Ct. Woodruff Cnty, Ark.) (filed May 19, 2022); *Johnson v. ARcare*, No. 22-cv-571 (E.D. Ark.) (filed June 17, 2022).

On May 26, 2022, ARcare delivered copies of the summons and complaints to the HHS Office of General Counsel, as required by 42 U.S.C. § 233(b), requesting that the United States be substituted in ARcare's place in accordance with § 233 in the *Hale*, *Engles*, *White*, *Gilmore*, and *Whitkanack* actions. App. 84– 85, R. Doc. 35-1 at 1–2. As a courtesy, ARcare also notified the U.S. Attorney for the Eastern District of Arkansas that it was requesting removal of the two state actions and substitution of the United States as the proper defendant in all five

actions filed at that time.[1] App. 86–87, R. Doc. 35-2 at 1–2 (acknowledging E.D. Ark. U.S. Attorney's Office received notification from ARcare). As to both cases that originated in state court; *Engles*, No. 22-cv-43 and *Whitkanack*, No. 22-cv-46; the Attorney General did not make an appearance, as required by § 233(*l*)(1), to report HHS's prior prospective deeming determinations as to the period in which the alleged acts and omissions underlying Plaintiffs' claims occurred. *Engles* Notice of Removal at 15 (indicating Attorney General had not appeared as of June 13, 2022); Notice of Removal at 14, *Whitkanack v. ARcare*, 22-cv-00140 (E.D. Ark. 2022), ECF No. 1 (hereinafter "*Whitkanack* Notice of Removal") (same). Accordingly, on June 13, 2022, ARcare removed both cases to the United States district court for the Eastern District of Arkansas pursuant to 42 U.S.C. § 233(*l*)(2) and 28 U.S.C. § 1442. *Engles* Notice of Removal at 1; *Whitkanack* Notice of Removal at 1.

On July 13, 2022, the *Engles* Plaintiffs moved to remand that action to state court. Motion to Remand, *Engles*, No. 22-cv-00139, ECF No. 17. The court denied the motion, observing "it appears that ARcare is a Public Health Services [*sic*] employee under 42 U.S.C. section 233(a) and is a federal officer or person acting under a federal officer under 28 U.S.C. section 1442" and directing that the

---

[1] Under 42 U.S.C. § 233(b), HHS—not ARcare—is required to provide such notice.

12

question of "[w]hether the United States should be substituted as the proper defendant will be taken up at a hearing . . . set by separate notice." Order Denying Motion to Remand, *Engles*, No. 22-cv-00139, ECF No. 55 at 1 (citing 42 U.S.C. § 233(*l*)(2)).

On March 1, 2023, the district court granted joint motions to consolidate in the *Hale, White, Gilmore, Whitkanack,* and *Johnson* cases*,* and designated *Hale* as the lead case. App. 8, R. Doc. 17 at 1. Shortly thereafter, in April 2023, the *Engles* Court ordered that case be consolidated with *Hale* as well. Order Consolidating Cases, *Engles*, No. 22-cv-00139, ECF No. 57 at 1. Following consolidation of the six cases, on June 2, 2023, the named Plaintiffs in *Hale*, *White*, *Gilmore*, and *Whitkanack* filed a "Consolidated Class Action Complaint" on behalf of themselves and all others similarly situated.  App. 13–82, R. Doc. 19 at 1–70.

The Consolidated Complaint alleges that ARcare failed to safeguard Plaintiffs' and the class members' personal information—provided to ARcare in connection with or related to health care services they received as ARcare patients—as required by, *inter alia*, HIPAA and its implementing regulations. *See* App. 41, R. Doc. 19 at 29 ¶ 108. In essence, the complaint alleges: (1) Plaintiffs and putative class members sought and obtained health care services from ARcare and that, as a condition of receiving such services, Plaintiffs and the putative class members had to furnish personal information to ARcare; App. 63, 67, R. Doc. 19

at 51 ¶ 176, 55 ¶ 194; (2) ARcare breached duties owed, and implied promises made, to Plaintiffs and the putative class members by failing to safeguard and protect their personal information and by failing to detect the data breach within a reasonable time; App. 65, R. Doc. 19 at 53 ¶ 186; and, as a result, (3) an unauthorized individual (or individuals) was able to infiltrate and access Plaintiffs' and the putative class members' personal information from ARcare's electronic health records system, causing them to suffer actual damages, as well as "an imminent and ongoing risk of future harm;" App. 19, 49, R. Doc. 19 at 7 ¶ 28, 37 ¶ 132.

On July 26, 2023, ARcare moved to substitute the United States in its place as the only proper defendant in this action or, in the alternative and based on its asserted federal immunity, to dismiss the consolidated complaint under Fed. R. Civ. P. 12(b)(6). App. 9, R. Doc. 25 at 1–2; App. 9, R. Doc. 26 at 1–26. Plaintiffs did not take a position on the motion. App. 10, R. Doc. 30 at 1. At the court's behest, the United States filed a statement of interest, pursuant to 28 U.S.C. § 517, opposing ARcare's motion to substitute. App. 10, R. Doc. 33 at 1 (Order inviting U.S. to file Statement of Interest); App. 10, R. Doc. 35 at 1–31 (U.S. Statement of Interest).

On March 8, 2024, following a January 25, 2024, hearing in which counsel for Plaintiffs, ARcare, and the United States argued, the district court denied

ARcare's motion, concluding that "protecting patients' confidential information is not a medical or related function for purposes of section 233(a) immunity." App. 144, Add. 2, R. Doc. 39 at 2. Although the district court acknowledged that the statute's inclusion of "related functions" within its immunity-granting provision could conceivably apply to acts and omissions in safeguarding patient confidentiality, it excluded ARcare's alleged conduct from the statute's protection. App. 148–49, Add. 6–7, R. Doc. 39 at 6–7. In reaching its holding, the district court contrasted its read of "[m]ost cases in which courts have applied section 233(a) immunity to claims for failure to protect private information [as] involv[ing] conduct that occurred during the course of medical treatment within the context of the provider-patient relationship" with "the conduct at issue here, [which] occurred outside of the provision of medical services." *Id.*

On April 5, 2024, ARcare timely noticed this appeal. App. 150–52, R. Doc. 44 at 1–3.

## STANDARD OF REVIEW

The district court's denial of absolute immunity is reviewed *de novo*. *Alternate Fuels, Inc. v. Cabanas*, 435 F.3d 855, 858 (8th Cir. 2006) (citing *White v. Holmes*, 21 F.3d 277, 279 (8th Cir. 1994)).

//

//

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

ARcare is entitled to absolute immunity from Plaintiffs' claims. The district court erred in concluding otherwise. The grant of absolute immunity provided to health centers under 42 U.S.C. § 233(a) and (g) includes immunity from *any* action or proceeding so long as the claim, and the underlying conduct giving rise to it, meet statutory criteria for immunity. Contrary to the district court's reading, nothing in the statute's broad language limits its comprehensive grant of absolute immunity to (allegedly tortious) conduct occurring "during the course of medical treatment" or precludes immunity because the "conduct at issue here[] occurred outside of the provision of medical services." App. 148–49, Add. 6–7, R. Doc. 39 at 6–7.

The availability of § 233(a) immunity hinges on: (1) the defendant's "final and binding" status as a deemed PHS employee; and (2) the claim resulting from defendant's official conduct, *i.e.*, the performance of "medical, surgical, dental or related functions . . . while acting within the scope of [the federal] office or employment." 42 U.S.C. § 233(a). When these criteria are met, the statutory immunity bars "any civil action or proceeding" against the health center by making the damages remedy against the United States under the FTCA "exclusive." 42 U.S.C. § 233(a), (g); *see Hui*, 559 U.S. at 806 (endorsing plain reading at the urging of the United States); *see also* Brief for the United States as Amicus Curiae

16

Supporting Petitioners, *Hui*, 559 U.S. 799 (No. 08-1529), 2009 WL 4759119 (filed July 2009, with then-Solicitor General Elena Kagan as counsel of record).

ARcare meets statutory requirements for immunity from Plaintiffs' suit. There is no dispute that HHS prospectively deemed ARcare to be a PHS employee during the period in which Plaintiffs' claims arose. *Engles* Notice of Removal at 107 (notice of deeming action, indicating deemed status is "comparable to an occurrence policy without a monetary cap"). It is likewise undisputed that ARcare was acting within the scope of its deemed federal employment with respect to the acts and omissions alleged in Plaintiffs' complaint. *See* App. 106–07, R. Doc. 37 at 16–17.[2]

The issue to be decided is whether the safeguarding of patient information is a "medical . . . or related function" within the meaning of § 233(a). And it is clear from the record—in particular Plaintiffs' complaint—that their claims, as alleged,

---

[2] It is well settled that scope of employment under the FTCA is controlled by the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Agyin*, 986 F.3d at 184 ("[N]either the regulation nor the [HHS FTCA] manual would be able to alter the . . . state-law test."). In other words, the inquiry is governed by the "applicable state law of respondeat superior." *Piper v. United States*, 887 F.2d 861, 863 (8th Cir.1989) (noting Arkansas respondeat superior law controlled). Under Arkansas law, "whether the employee's action is within the scope of the employment depends on whether the individual is carrying out the 'object and purpose of the enterprise,' as opposed to acting exclusively in his own interest." *Daniels v. Lutz*, 407 F. Supp. 2d 1038, 1050 (E.D. Ark. 2005); *see also Piper*, 887 F.2d at 863 (In Arkansas, "an employee acts within the scope of employment . . . when he acts for his employer's benefit or furthers his employer's interest.").

result from ARcare's performance of "medical . . . or related functions" as § 233(a)

requires. First, "there is nothing in the language of § 233(a) to support [the]

conclusion" that "§ 233(a) provides immunity only from medical malpractice

claims," *Cuoco v. Moritsugu*, 222 F.3d 99, 108 (2d Cir. 2000), or that "the alleged

tort occur during the provision of services," *Friedenberg*, 68 F.4th at 1118. Second,

contrary to the district court's decision, the protection of patient information is a

fundamental aspect of medical care, whether the relevant acts and omissions in

safeguarding patient confidentiality occur during or outside of direct patient care.

*Krandle v. Refuah Health Ctr., Inc.*, No. 22-cv-4977, 2024 WL 1075359, at *9

(S.D.N.Y. Mar. 12, 2024) (concluding maintaining confidentiality is a "function .

. . essential to the practice of medicine"); *Doe v. Neighborhood Healthcare*,

No. 21-cv-1587, 2022 WL 17663520, at *7 (S.D. Cal. Sept. 8, 2022) (recognizing

privacy is "necessary to effectively treat patients").

## ARGUMENT

### I. The Absolute Immunity At Issue Covers *Any* Action Or Proceeding Resulting From The Performance Of Medical Or Related Functions Within The Scope Of Official Employment

The grant of absolute immunity provided to health centers under 42 U.S.C.

§ 233(a) and (g) includes immunity from *any* civil action or proceeding resulting

from a health center's performance of medical or related functions undertaken

within the scope of employment. 42 U.S.C. § 233(a), (g)(1)(A) (establishing that

for deemed PHS employees "[t]he remedy . . . shall be exclusive of any other civil action or proceeding to the same extent as the remedy against the United States"); *see also* 42 U.S.C. § 233(g)(1)(F) ("[o]nce the Secretary makes a determination that an entity . . . is deemed to be an employee of the Public Health Service for purposes of [§ 233], the determination [is] . . . *final and binding* upon the Secretary and the Attorney General and other parties to *any civil action or proceeding*.") (emphasis added).

The district court erred in interpreting the governing statutory scheme as limiting immunity to only those suits alleging "conduct that occurred during the course of medical treatment within the context of the provider-patient relationship." App. 148–49, Add. 6–7, R. Doc. 39 at 6–7. The PHS Act's plain text makes no such limitation. Its "broad" and unqualified language instead provides deemed and actual PHS employees "the same," § 233(g)(1)(A), "comprehensive" immunity, covering "any other civil action . . . both known and unknown." *Hui*, 559 U.S. at 806. The immunity right is neither coterminous with the FTCA's remedy nor limited to suits alleging (or sounding in) medical malpractice. *Id.* at 806–07 (citing *United States v. Stanley*, 483 U.S. 669, 684 (1987) for proposition that "the availability of a damages action under the Constitution for particular injuries . . . is a question logically distinct from immunity to such an action on the

part of particular defendants"); *accord Krandle v. Refuah Health Ctr., Inc.*, No. 22-cv-4977, 2024 WL 1075359, at *7 (S.D.N.Y. Mar. 12, 2024).

### A. The Scope Of § 233(a) Immunity Is Entirely Separate From The Scope Of The FTCA's Remedy

The district court's unduly narrow reading of § 233(a) conflicts with that provision's "broad" language and "comprehensive" grant of official immunity. *Compare* App. 148–49, Add. 6–7, R. Doc. 39 at 6–7, *with Hui*, 559 U.S. at 806. It is well established that the PHS Act confers suit immunity regardless of whether the claim fits within the FTCA's limited waiver of sovereign immunity. *Hui*, 559 U.S. at 807; *see also United States v. Smith*, 499 U.S. 160, 162 (1991) (holding Government employees' absolute immunity applies even where FTCA precludes a plaintiff's suit); *accord Krandle*, 2024 WL 1075359, at *7 (rejecting Government contention "§ 233(a) should be narrowly construed because it waives sovereign immunity").[3] The broad scope of § 233(a) immunity is entirely separate from the FTCA's limited waiver of the United States' sovereign immunity. When assessing the former, the latter "is a separate question which § 233 says nothing about." *Krandle*, 2024 WL 1075359, at *7 (citing *Smith*, 499 U.S. at 162).

---

[3] *Cf.* App. 10, R. Doc. 35 at 25 (United States' Statement of Interest, asserting "doctrine of sovereign-immunity precludes ARcare's expansive reading of the statute to embrace data-breach claims because the scope of immunity afforded to health centers is also a waiver of sovereign immunity for the United States").

Two subsections of 42 U.S.C. § 233 together provide the immunity at issue.

First, Congress provided in the Emergency Health Personnel Act of 1970, Pub. L.

No. 91-623, that:

> The remedy against the United States provided by sections 1346(b) and 2672 of title 28 . . . for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions . . . by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.

§ 233(a). Second, with the 1992 passage and 1995 amendment of the FSHCAA,

Congress unequivocally provided health centers and their personnel "the same"

immunity afforded to commissioned officers and employees of the Public Health

Service:

> The remedy against the United States for [a public or non-profit private entity receiving Federal funds under section 254b of this title] and any officer, governing board member, employee, or contractor . . . of such an entity who is deemed to be an employee of the Public Health Service pursuant to this paragraph shall be exclusive of any other civil action or proceeding to the same extent as the remedy against the United States is exclusive pursuant to subsection [233](a).

§ 233(g)(1)(A), (4); *see Agyin*, 986 F.3d at 177 (concluding deemed PHS physician

"received from the federal government a delegation of the same legal immunity

that is extended to employees of the Public Health Service"); *Friedenberg*,

68 F.4th at 1127 ("Congress intended for deemed PHS employees to receive

protection 'in the same manner' as traditional PHS employees during the coverage period.").

Thus, per plain statutory text: where deemed federal employees were acting within the scope of their employment when the conduct giving rise to the claim occurred, and that conduct constituted the performance of medical or related functions, the exclusive remedy for personal injury resulting from those acts or omissions is against the United States under the FTCA, 28 U.S.C. § 1346(b). 42 U.S.C. § 233(a), (g)(1)(A); *accord Agyin*, 986 F.3d at 184; *see also Hui*, 559 U.S. at 806 ("[§] 233(a) grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct.").

The ultimate viability of a plaintiff's claims under the FTCA is irrelevant to a deemed PHS defendant's absolute immunity under § 233(a). Although the FTCA effects a limited waiver of sovereign immunity, § 233(a) simply "makes the Federal Tort Claims Act the exclusive remedy for specified actions against members of the Public Health Service." *Cuoco*, 222 F.3d at 107; *accord Krandle*, 2024 WL 1075359, at *2. Indeed, official immunity can apply even where the FTCA "precludes recovery against the government." *Smith*, 499 U.S. at 165 (analyzing analogous exclusive remedy provision for military medical personnel).

As a common example, cases brought against deemed health centers are often dismissed following the substitution of the United States for plaintiffs' failure to comply with the FTCA's administrative exhaustion requirements. *See, e.g.*, *Motley v. United States*, 295 F.3d 820, 821 (8th Cir. 2002) (noting United States certified claim against deemed health center and removed to federal district court where action was dismissed for failure to exhaust FTCA's administrative remedies); *Briseno v. Fam. Health Ctr.*, No. 05-cv-4344, 2005 WL 3242058, at *1 (W.D. Mo. Nov. 30, 2005) (same).

### B. There Is No Textual Basis For The District Court's Limitation Of Section 233(a) Immunity To Acts And Omissions Occurring During Medical Treatment

Congress unequivocally immunized deemed and actual PHS employees from "*any* . . . civil action or proceeding" against them "resulting from" their "performance of medical . . . or related functions" undertaken within the scope of their employment. 42 U.S.C. § 233(a) (emphasis added); *Hui*, 559 U.S. at 805–06. While acknowledging that "immunity under section 233(a) is not limited to medical malpractice claims," the district court nonetheless erroneously concluded that immunity extends only to "conduct that occurred during the course of medical treatment" or "in the provision of medical services." App. 146, 148–49, Add. 4, 6–7, R. Doc. 39 at 4, 6–7. The decision appears to have borrowed state law medical negligence concepts and framing to effectively limit § 233(a) immunity to only

those claims alleging or sounding in medical malpractice. *Compare* App. 148–49, Add. 6–7, R. Doc. 39 at 6–7, *with, e.g.*, Ark. Code § 16-114-201(1) (defining "action for medical injury" as "action[] against a medical care provider"), (2) (defining "medical injury" and "injury" as "any adverse consequences arising out of or sustained *in the course of the professional services being rendered by a medical care provider to a patient*") (emphasis added), *and Malpractice*, Black's Law Dictionary (11th ed. 2019) (defining "medical malpractice" as "[a] doctor's failure to exercise the degree of care and skill that a physician or surgeon of the same medical specialty would use under similar circumstances").

The narrow boundaries the district court's decision draws around the immunity right have no basis in the statute's plain language. *Cuoco*, 222 F.3d at 108. "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

Beginning with immunized individuals, § 233(a) protects not only medical providers, but "*any* commissioned officer or employee of the Public Health Service." 42 U.S.C. § 233(a) (emphasis added); *see Krandle*, 2024 WL 1075359, at *10 (S.D.N.Y. Mar. 12, 2024) ("Nor must the related function be performed by a physician . . . .What matters instead is the substantive connection between those functions . . . ." (citations omitted)). The 1970 enactment of the Emergency Health

Personnel Act—which amended the PHS Act to provide the immunity right at issue—was accomplished against the backdrop of existing PHS Act provisions, which had made clear for decades that PHS personnel include not only "medical and dental officers," but also, *inter alia*, "specially qualified scientific, professional and administrative personnel," among others. Public Health Service Act, c. 373, § 209, 58 Stat. 682, 686 (1944), *codified at* 42 U.S.C. § 210 (setting pay and allowances for PHS personnel including for "the services of [such] personnel. . . ."); *id.* § 211, *codified at* 42 U.S.C. § 212(a)(4)(ii) (differentiating "medical and dental officers" from other PHS officers and employees for purposes of retirement).

Turning to covered conduct, § 233(a)'s reference to "medical, dental, surgical, or related functions" likewise plainly mandates that immunity extend beyond suits alleging medical malpractice or based on conduct occurring during medical treatment. App. 148, Add. 6, R. Doc. 39 at 6; *see Friedenberg*, 68 F.4th at 1128 ("We must give meaning to the plain text of the statute, and here, § 233(a) plainly encompasses damages stemming from the performance of medical and 'related' functions."); *Pomeroy v. United States*, No. 17-cv-10211, 2018 WL 1093501, at *2 (D. Mass. Feb. 27, 2018); *accord Krandle*¸ 2024 WL 1075359, at *10 (collecting cases). Congress's illustrative inclusion of "the conduct of clinical studies or investigations" within the "medical, dental, surgical or related functions"

25

further detracts from the narrow, "treatment-focused reading" the district court employed. *See Krandle*, 2024 WL 1075359, at *4. PHS studies and investigations are governed by 42 U.S.C. § 241, which not only authorizes research and investigation into the "causes, diagnosis, [and] treatment" of diseases but also extends to "water purification, sewage treatment, and pollution of lakes and streams" to the extent each is "relating to" "physical and mental diseases and impairments." 42 U.S.C. § 241; *see Krandle*, 2024 WL 1075359, at *4. The text, in short, "clearly shows that immunity is not tied to whether the tort transpired in caring for the patient." *Friedenberg*, 68 F.4th at 1127.

Surrounding language and related statutory provisions likewise defeat the district court's narrow, treatment-based reading of § 233(a) immunity. Looking just beyond § 233(a) to § 233(g)—through which the federal government delegated to health centers "the same legal immunity that is extended to employees of the Public Health Service," *Agyin*, 986 F.3d at 177—the provision's plain language defeats a reading of § 233(a) immunity as applying only to acts and omissions occurring during a physician's treatment of a patient. When providing that deemed health centers would enjoy "the same" immunity as actual PHS employees, Congress explicitly immunized not only health center providers, but health center entities and "any officer, [or] governing board member . . . of . . . an entity who is deemed to be an employee of the Public Health Service." 42 U.S.C. §

233(g)(1)(A). The FSHCAA's extension of § 233(a) immunity to deemed health centers' governing board members, who do not themselves perform medical functions, undercuts the district court's narrow reading. 42 U.S.C. § 233(g)(1)(A)–(F); *id.* § 254b(k)(3)(H)(i) (requiring boards be composed of individuals "a majority of whom are being served by the center and who, as a group, represent the individuals being served by the center"); *see also* H.R. Rep. No. 104-398 at 10–11 ("clarify[ing] that all officers, employees, and governing board members would receive FTCA coverage whether or not they are health care practitioners"). Various references to "health care professional," "health care provider," and "health care practitioner,"—the latter utilized forty-fives times—outside of, and not within, § 233(a) further support that the best reading of § 233(a) is not one that limits its immunity to acts and omissions occurring during the course of medical treatment. *See generally* 42 U.S.C. § 233.

Finally, Plaintiffs' claims clearly "result from" ARcare's covered conduct, even though the alleged acts and omissions occurred outside of direct patient treatment. Section 233 does not define what it means for a claim to "result from" a deemed entity or employer's performance of medical or related functions. The statute likewise does not explicitly define "giving rise to" when it indicates that immunity applies for "acts and omissions giving rise to" a claim. *Id.* § 233(a). Accordingly, ordinary meaning controls. *See FDIC v. Meyer*, 510 U.S. 471, 476

(1994) ("In the absence of [a statutory] definition, we construe a statutory term in accordance with its ordinary or natural meaning.") (citing *Smith v. United States*, 508 U. S. 223, 228 (1993)). A "result" ordinarily means a "physical, logical, or legal consequence." *Result*, Black's Law Dictionary (11th ed. 2019); *see also Result*, Ballentine's Law Dictionary (3d ed. 1969) ("A consequence. That which has happened."); *Consequence*, Ballentine's Law Dictionary (3d ed. 1969) ("That which follows as the result or effect of a cause"). To "result from" something is to be a consequence of that thing, to have happened because of it. Similarly, "to arise" means "[t]o come into being . . . as a cause of action arising at a particular time and place." *Arise*, Ballentine's Law Dictionary (3d ed. 1969); *see also Arise*, Black's Law Dictionary (11th ed. 2019) ("To originate; to stem (from).").

To require that a cause of action "result from" a deemed defendant's "performance of medical. . . and related functions"—or that a defendant's acts or omissions in performing such functions gave rise to a plaintiff's claim—is simply to find that the action in some way originates in, stems from, or is a consequence of the deemed defendant's performance of medical or related functions. *Cf. State Farm Mutual Auto. Ins. Co. v. Davis*, 937 F.2d 1415, 1419 (9th Cir. 1991) (concluding common insurance policy phrase "resulting from" should be interpreted to require only a "slight causal connection"); *Am. Nat'l Property and Cas. Co. v. Julie R.*, 76 Cal. App. 4th 134, 138, 146, n.1 (1999) (interpreting

insurance policy phrases "result from" and "arising out of" to require only "some minimal causal connection").

## C. Related Functions Within The Meaning Of § 233(a) Include Those Intertwined With Medical Care

To construe "related functions," as the district court did, to mean only those functions "involv[ing] conduct that occurred during the course of medical treatment within the context of the provider-patient relationship," or in "the provision of medical services," App. 148, Add. 6, R. Doc. 39 at 6, violates basic rules of statutory construction. Medical functions are—by both dictionary definition and common sense—the various activities "appropriate to" the practice of medicine.

The statute's application to claims "resulting from the performance of medical or. . . related functions," § 233(a), should be "construe[d] . . . in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994); *see also, e.g., Mohamad v. Palestinian Authority*, 566 U.S. 449, 456 (2012) (concluding "individual," as used in Torture Victim Protection Act, does not include an organization). The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). Where, as here, statutory "language is plain, the sole function of the

courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Id.*; *accord Carton v. Gen. Motor Acceptance Corp.*, 611 F.3d 451, 458 (8th Cir. 2010). That task is accomplished by "giv[ing] effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *accord Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").

First, a function is an "[a]ctivity that is appropriate to a particular business or profession." *Function*, Black's Law Dictionary (11th ed. 2019). In ordinary parlance, "medical, surgical, [and] dental" are all areas of health care practice. Medical means "pertaining or related to the healing art of its professors. Also, in a narrower sense, pertaining or relating to 'medicine; as distinguished from surgery, obstetrics, etc." *Medical,* Oxford English Dictionary (2d Ed. 1961); *see also Medicine*, Oxford English Dictionary (2d Ed. 1989) ("That department of knowledge and practice which is concerned with the cure, alleviation, and prevention of disease in human beings, and with the restoration and preservation of health.").

Second, the term "medical" is necessarily broad. It, along with "surgical" and dental," are "adjectives that *pertain* or *relate* to treatment" but "are not exclusively defined *by* treatment." *Krandle*, 2024 WL 1075359, at *4. Medical *care*, for instance, "deals not only with problems of disease and injury, but also

with problems of birth, death, and living—problems that are separate from disease or injury." Alfred W. Childs, *The Functions of Medical Care*, Pub. Health Rep. 10, 10 (1975), https://bit.ly/3LanlMh.

Third, "Related," used as an adjective, most commonly means connected in some way. *See, e.g.*, *Related*, adj., Oxford English Dictionary (3d Ed. Dec. 2009) ("Connected or having relation to something else."); *Related*, Black's Law Dictionary (Rev. 4th ed. 1968) ("Standing in relation; connected; allied; akin."). Related is "typically defined broadly and is not even necessarily tied to the concept of a causal connection." *Krandle*, 2024 WL 1075359, at *5 (quoting *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128–29 (2d Cir. 2001) (internal bracketing omitted); *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (ordinary usage of words "related to" means to broaden and expresses a broad purpose); *accord Barcomb v. Gen. Motors LLC*, 978 F.3d 545, 552 (8th Cir. 2020) ("the phrase 'relating to' is not a strict, severely limiting term. When we have interpreted it in the past, we have given the term its broad plain meaning.").

It follows that a "related function" is a type of activity "having a distinct connection to" medical care, treatment, services, and other medical "functions." *Friedenberg*, 68 F.4th at 1130 (collecting and analyzing cases); *see also Z.B. v. Ammonoosuc Cmty. Health Servs., Inc.*, No. Civ. No. 03-cv-540, 2004 WL 1571988, *4 (D. Me. June 13, 2004) (phrase "related to" in agency's FSHCAA

31

regulation, 42 C.F.R. § 6.6(d), recognizes that § 233(a) immunity extends beyond the mere act of providing medical care), *report and recommendation adopted sub nom. Z.B. ex rel. Kilmer v. Ammonoosuc Cmty. Health Servs., Inc.*, 2004 WL 1925538 (D. Me. Aug. 31, 2004). As the district court itself acknowledged, it takes relatively little effort to amass a list of functions that are "interwoven" with, *i.e.*, that bear a close relation to, medical functions. App. 146, Add. 4, R. Doc. 39 at 4 (citing *Goss v. United States*, 353 F. Supp. 3d 878, 886 (D. Ariz. 2018); *Friedenberg*, 68 F.4th at 1130; *Brignac v. United States*, 239 F. Supp. 3d 1367, 1377 (N.D. Ga. 2017); *Teresa T. v. Ragaglia*, 154 F.Supp.2d 290, 300 (D. Conn. 2001)).

Reading § 233(a) in context—against the PHS Act as it existed when § 233(a) was added—reinforces the point. Medical and related functions are best understood to encompass not only direct patient care and treatment, but also, as noted *supra*, PHS employees' various required "scientific, professional, and administrative" activities, as well as "related technical . . . services," among other wide-ranging and diverse responsibilities. Public Health Service Act, c. 373, §§ 321 & 323, 58 Stat. 682, 695, 697 (1944), *codified at* 42 U.S.C. §§ 248, 250. Under the 1944 PHS Act, PHS personnel were responsible for such non-treatment activities as, for example, the management, operations, and "control" of PHS facilities, as well as "transfer of patients," between facilities, and, under the PHS

Act's generous quarantine authority, the "detention . . . . apprehension and examination" of various categories of individuals. *Id.* §§ 321, 361, 363, *codified at* 42 U.S.C. §§ 248, 264, 266; *see also* Act of July 28, 1955, c. 417, § 3, 69 Stat. 382, *codified at* 42 U.S.C. § 242b (authorizing PHS to "[a]cquire, construct, improve, repair, operate, and maintain laboratory, research, and other necessary facilities and equipment, and such other real or personal property (including patents) as the Secretary deems necessary"); *cf. De La Cruz v. Graber*, No. 16-cv-1294, 2017 WL 4277129, at *3–4 (C.D. Cal. June 15, 2017), *report and recommendation adopted*, 2017 WL 4271122 (C.D. Cal. Sept. 21, 2017) (concluding medical administrator, whose performance of administrative duties gave rise to constitutional tort claim, was immune under § 233(a)). It is also plainly apparent that when Congress wished to focus more narrowly on medical care or treatment within the PHS Act, rather than on broadly defined "medical . . . or related functions" it did not do so coyly. *See, e.g.*, 42 U.S.C. §§ 217b (authorizing volunteer services "for use in the operation of any health care facility or in the provision of health care"), 242b (authorizing HHS to "[a]dmit and treat at hospitals and other facilities of the [Public Health] Service persons not otherwise eligible for admission and treatment at such facilities"), 247e ("The Secretary shall without charge provide short-term care and treatment, including outpatient care, for Hansen's disease and related complications . . . ."), 252 (providing for "physical and mental examinations" of

aliens), 253 (entitling various government employees to "medical, surgical, and dental treatment and hospitalization by the Service.").

An endorsement of the district court's reading would impermissibly invalidate Congress' explicit inclusion of "related functions" in § 233(a). *See Friedenberg*, 68 F.4th at 1128 (citing *Pomeroy*, 2018 WL 1093501, at *10 ("The statute must cover a broader scope of activity than the delineated categories alone, or else 'related functions' would be mere superfluity."); *see also Krandle*, 2024 WL 1075359, at *10 (rejecting reading of 233(a) as requiring "a *direct* connection to the course of medical treatment"); *Bennett*, 375 F. Supp. 3d at 1187 (rejecting Government's "overly restrictive view on the coverage of § 233(a)" based on arguments "that under cannons [sic] of statutory interpretation, the general term 'related function' should be construed to only embrace subjects similar in nature to those enumerated by the specific terms that preceded it."); *but see Ford v. Sandhills Med. Found., Inc.*, 97 F.4th 252, 262 (4th Cir. 2024); *Marshall v. Lamoille Health Partners, Inc.*, No. 22-cv-166, 2023 WL 2931823, at *5 (D. Vt. Apr. 13, 2023) (holding "protection from cyberattack" is not a "related function"). Simply put: the word "related" in § 233(a) "cannot be meaningless, else [it] would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936).

Indeed, employing the fundamental interpretive guideline that undefined terms be given their ordinary meaning, courts have repeatedly concluded that such

diverse functions as hiring, supervision, retention, reporting suspected abuse of both patients and nonpatients, coordination with law enforcement and the judiciary, ensuring staff members' adherence to patient care plans, and other "administrative and operational duties" are so "interwoven" with medical care as to be "related functions" within the meaning of § 233(a). *C.K. v. United States*, No. 19-cv-2492, 2020 WL 6684921, at *6–7 (S.D. Cal. Nov. 12, 2020) (quoting *Kezer v. Penobscot Cmty. Health Ctr.*, No. 15-cv-225, 2019 BL 141566, at *2 (D. Me. March 21, 2019)); *see, e.g., Friedenberg*, 68 F.4th at 1128–29; *Sanchez v. United States*, No. 18-cv-1550, 2019 WL 3766615, at *4 (S.D. Cal. Aug. 9, 2019) (concluding negligent hiring, supervision, and retention claims resulted from performance of related functions); *M.G. v. United States*, No. 19-cv-1252, 2020 WL 6271186, at *3 (S.D. Cal. Oct. 23, 2020) (same); *Bennett v. United States*, 375 F. Supp. 3d 1180, 1187 (W.D. Wash. 2019) (holding failure to supervise provider with known history of "poor judgment with female patients" was related function); *see also Brignac*, 239 F. Supp. 3d at 1377 (determining "hiring and retention of . . . physicians is directly connected to [the] provision of medical care"); *Ragaglia*, 154 F.Supp.2d at 300 (concluding "FSHCAA . . . provides immunity" where plaintiffs alleged doctor's violation of his statutory duty to report child abuse constituted deliberate indifference and negligence per se); *Z.B.*, 2004 WL 1571988, at *3 (concluding deemed physician's failure to report suspected child abuse was

"related" to medical services because the duty to report "arises out of the employees' status as medical professionals").

Had Congress wanted to limit immunity to solely medical functions—or, indeed, to medical *treatment* as an even more narrow subset of those functions—it could easily have done so. *See United States v. I.L.*, 614 F.3d 817, 822 (8th Cir. 2010) (citing *McElroy v. United States*, 455 U.S. 642, 656 (1982) ("While Congress could have written the statute to produce this result, there is no basis for us to adopt such a limited reading.")). It did not. Instead, Congress enacted a law extending immunity to claims resulting not only from "medical, surgical, and dental . . . functions" but also from "related functions." 42 U.S.C. § 233(a).

## II.    Plaintiffs' Claims Result From ARcare's Performance Of Medical And Related Functions

ARcare's acts and omissions in safeguarding patient confidentiality constitute the performance of medical or related functions. The record is clear: Plaintiffs' claims result from ARcare's conduct in safeguarding the confidentiality of its patients' information, which constitutes the performance of medical or related functions. The district court erred in concluding otherwise.

The gravamen of this putative class action is a breach of confidentiality claim resulting from ARcare's alleged failure to protect patient privacy and ensure the confidentiality of patient information. App. 13–14, R. Doc. 19 at 1 ¶ 1. The consolidated complaint asserts that Plaintiffs' harm results from ARcare's alleged

failure to adequately safeguard patient data and information from a "cyberattack and data breach" that was "targeted at ARcare due to its status as a health services provider" and resulted in the unauthorized access of ARcare patients' "medical treatment information, prescription information, medical diagnosis or condition information, [and] health information," which Plaintiffs provided to ARcare "as part of [their] care and treatment, and as a requirement to receive [ARcare]'s services." App. 19, 20, 22, 24, 26, 42, R. Doc. 19 at 7 ¶ 29, 8 ¶ 31, 10 ¶ 43, 12 ¶ 51, 14 ¶ 24, 30 ¶ 110.[4] The complaint, in other words, alleges conduct either fitting within or bearing a "distinct connection" to medical functions. App. 149, Add. 7, R. Doc. 39 at 7 (citing *Friedenberg*, 68 F.4th at 1130).

## A. The Obligation To Protect The Confidentiality Of Patient Information Has Long Been Interwoven With Medical Care

The duty to protect the confidentiality of patient data has long been inextricably woven into the fabric of medical care. *See, e.g.*, Edelstein, *The Hippocratic Oath: Text, Translation, and Interpretation* 3 (1943); *see also* Standards for Privacy of Individually Identifiable Health Information ("Privacy Preamble"), 65 Fed. Reg. 82,462-01 at 82,467 (Dec. 28, 2000) (*codified at* 45 C.F.R. pt. 160) ("The need for privacy of health information, in particular, has long been recognized as critical to the delivery of needed medical care."). Reflecting the

---

[4] The complaint was originally filed with misnumbered paragraphs.

close connection between patient care and provider duties to maintain confidentiality, some rendition of a pledge to privacy has been included in the code of ethics of nearly all health care professionals in the United States, beginning with the American Medical Association's 1847 first Code of Ethics. Institute of Medicine, Committee on Health Research and the Privacy of Health Information, *Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research* 86 (2009), https://www.ncbi.nlm.nih.gov/books/NBK9579/. The current American Medical Association's Code of Medical Ethics mandates that "[p]hysicians must seek to protect patient privacy in all settings to the greatest extent possible," as "protecting information gathered in association with the care of the patient is a core value in health care." American Medical Association (hereinafter "AMA"), Code of Medical Ethics § 3.1.1, *Privacy in Health Care*, https://code-medical-ethics.amaassn.org/ethics-opinions/privacy-health-care; *see also id.* § 3.3.2, *Confidentiality & Electronic Medical Records*, https://code-medicalethics. ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records ("Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored."). The Ethics Code further counsels that "respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust." AMA Code of Medical Ethics § 3.1.1 (privacy protections

extend to physical, informational, decisional, and associational forms of privacy); *see also* AMA, Opinion 3.2.1: *Confidentiality*, https://code-medical-ethics.ama-assn.org/ethicsopinions/confidentiality ("Patients need to be able to trust that physicians will protect information shared in confidence. . . . Physicians in turn have an ethical obligation to preserve the confidentiality of information gathered in association with the care of the patient."); AMA, Opinion 3.2.4: *Access to Medical Records by Data Collection Companies*, https://code-medicalethics. ama-assn.org/ethics-opinions/access-medical-records-data-collectioncompanies ("Information gathered and recorded in association with the care of a patient is confidential . . . . Disclosing information to third parties . . . without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship.").

Illustrating the close relationship between patient privacy and medical care, claims grounded in breaches of provider's duties to safeguard patient information and confidences have long been cognizable against health care providers. *See* Privacy Preamble, 65 Fed. Reg. at 82,473 ("In some states, patients can hold providers accountable for some unauthorized disclosures of health information about them under various tort theories, such as invasion of privacy and breach of a confidential relationship."); *see also Kezer*, No. 15-cv-225, 2019 BL 141566, at *6 (recognizing "breach of confidentiality by a health care provider is well within the

definition of professional negligence" under Maine statute governing medical malpractice suits).

Decades ago—prior to the passage HIPAA and the promulgation of its Privacy and Security Rules—when health information was primarily recorded on paper, safeguarding the confidentiality of patient information entailed relatively simple tasks—*e.g.*, closing examination room doors, restricting physical access to patient files, and instructing staff not to disclose patient information without consent. The classic "breach of confidentiality [thus] involved a physical exchange of paper records or a verbal exchange of information." Privacy Preamble, 65 Fed. Reg. at 82,465; Health Insurance Reform: Security Standards ("Security Preamble"), 68 Fed. Reg. 8,334, 8,344 (Feb. 20, 2003) (codified at 45 C.F.R. Parts 160 and 164) (acknowledging "technology is simply moving too fast" to proscribe blanket protective protocols and providing "a procedure as simple as locking backup diskettes in a safe place and restricting who has access to the key may be suitable for one entity, whereas another may need to store backed-up information off-site in a secure computer facility"); *see also* Centers for Medicare and Medicaid Services, Security 101 for Covered Entities at 3 (rev. Mar. 2007), https://bit.ly/4eG4vKF ("Prior to HIPAA . . . new technologies were evolving, and the health care industry began to move away from paper processes and rely more heavily on the use of computers to pay claims, answer eligibility questions, provide

health information and conduct a host of other . . . clinically based functions.").

Now, as "more and more health care providers" utilize new and different

technologies to provide health care services and "electronic means of storing and

transmitting health information," with the push of a button, "a person's most

profoundly private information can be shared with hundreds, thousands, even

millions of individuals and organizations at a time." Privacy Preamble, 65 Fed.

Reg. at 82,465.

Regardless of how a breach occurs, the impact to patients is distinctly

medical, reinforcing that patient privacy is essential to care. As HHS's Office of

the National Coordinator for Health Information Technology bluntly advises:

"providers and individuals alike must trust that an individual's health information

is private and secure" to ensure adequate patient care and avoid "life-threatening

consequences" stemming from mistrust. HHS, Office of the National Coordinator

for Health Information Technology, *Guide to Privacy and Security of Electronic

Health Information*, Ch. 1, https://bit.ly/3W3qkwg ("If your patients lack trust . . .

feeling that the confidentiality . . . of their electronic health information is at risk,

they may not want to disclose health information to you. Withholding their health

information could have life-threatening consequences."); *see also* Institute of

Medicine, Committee on Health Research and the Privacy of Health Information,

*Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through*

*Research*, 79 (2009), https://www.ncbi.nlm.nih.gov/books/NBK9579/(citing 2005 study in which one of eight respondents admitted to engaging in behaviors intended to protect their privacy—including lying to providers about symptoms or behaviors, refusing to provide information, paying out of pocket for insured care, and avoiding care altogether—even at the expense of their health).

Unauthorized access to and disclosure of patient information through cyberattacks "have led to extended care disruptions, patient diversions to other facilities, and delayed medical procedures, all putting patient safety at risk." *See* HHS News, *HHS Announces Next Steps in Ongoing Work to Enhance Cybersecurity for Health Care and Public Sectors* (Dec. 6, 2023), https://bit.ly/3I4xOaC/; *see also* Privacy Preamble, 65 Fed. Reg. at 82,467 ("No matter how or why a disclosure of personal information is made, the harm to the individual is the same."). Plaintiffs' complaint acknowledges the same. App. 42, R. Doc. 19 at 30 ¶¶ 112–13 ("Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack . . . . [and] have further found . . . the incident was associated with deterioration in timeliness and patient outcomes, generally.").

## B. ARcare's Legal Obligations To Safeguard Patient Confidentiality Underscore The Medical Or Medically-Related Nature Of Its Alleged Acts And Omissions

At the heart of Plaintiffs' action is the allegation that ARcare's duties—and alleged breach of those duties—arise from its status as a medical provider and, accordingly, as a covered healthcare entity under HIPAA and its implementing regulations. App. 18, R. Doc. 19 at 6 ¶ 23 (alleging "ARcare promises that it will protect its patients' privacy and remain in compliance with statutory privacy requirements" and excerpting ARcare's privacy statement, referencing HIPAA); App. 31, R. Doc. 19 at 19 ¶ 70 (asserting ARcare "had obligations created by HIPAA"); App. 41–42, R. Doc. 19 at 29–30 ¶¶ 106–10 (detailing ways in which ARcare's alleged "conduct violates HIPAA"); App. 45–47, R. Doc. 19 at 33–35 ¶ 122 (listing various alleged failures to comply with HIPAA implementing regulations).

HIPAA mandates a broad, technology-neutral, and flexible approach to covered entities' required protection of patient information, under which healthcare entities, like ARcare, must "maintain reasonable and appropriate administrative, technical, and physical safeguards" to "protect against any reasonably anticipated" (1) "threats or hazards to the security or integrity of the information," and (2) "unauthorized uses or disclosures of the information." 42 U.S.C. § 1320d-2(d)(2)(A)–(B). Congress left to the Executive Branch the task of detailing

providers' HIPAA-based confidentiality obligations, which HHS imposed via HIPAA's Privacy Rule and Security Rule. *See generally*, 45 C.F.R. § 164.500–164.534 (Privacy Rule); *id.* §§ 164.302–164.318 (Security Rule). The former establishes a set of federal standards for the protection of patient information, including information stored or transferred in electronic form, requiring, in pertinent part, that "[a] covered entity must have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information" against "any intentional or unintentional use or disclosure that is in violation of the standards, implementation specifications or other requirements of [the "Privacy Rule"]."). 45 C.F.R. § 164.530(c)(1)–(2); *see also id.* § 160.103 ("Disclosure means the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information."); Privacy Preamble, 65 Fed. Reg. at 82,467–68 ("Disclosure of individually identifiable information can occur deliberately or accidentally and can occur within an organization or be the result of an external breach of security . . . ."). The latter operationalizes the duty to protect patient information by directing the implementation of various required and addressable "specifications" to "protect against any reasonably anticipated threats or hazards to the security or integrity of such information" and "any reasonably anticipated uses or disclosures of such

information that are not permitted or required under subpart E of this part [*i.e.*, the Privacy Rule]." 45 C.F.R. § 164.306(a)(2)–(3).

Statutory obligations specific to health centers underscore that ARcare's acts and omissions to ensure patient confidentiality are medical or related functions within the meaning of § 233(a). In enacting the relevant PHS Act provisions, including as amended by the FSHCAA, Congress designed a statutory structure recognizing that proper maintenance of patient data—including the protection of private information and confidences obtained by virtue of the patient-provider relationship—is woven into medical care from initial patient encounters, through necessary care coordination, to the use of patient data in required ongoing quality assurance and quality improvement activities.

Health centers' successful efforts to protect private and confidential patient information are crucial to both their eligibility to receive federal funding and to be deemed PHS employees entitled to § 233(a) immunity. First, health centers are statutorily mandated, as a condition of their receipt of federal funding—itself a prerequisite to deemed PHS status—to implement and maintain systems to protect the confidentiality of patient information. 42 U.S.C. § 254b(k)(3)(C) (requiring quality improvements systems that "maintains the confidentiality of patient records"); *id.* § 233(g)(4) (providing, to qualify for deemed status, health center must be a "public or non-profit entity receiving Federal funds under section

45

254b"); *see also id.* § 233(h)(1) (requiring deemed PHS entities to implement policies "to reduce the risk of malpractice and the risk of lawsuits arising out of any health or health-related functions performed by the entity"). In recognition of this core obligation, HHS requires health centers applying for deemed status to acknowledge that their "failure to implement and maintain systems and procedures for protecting the confidentiality of patient information and safeguarding this information against loss, destruction, or unauthorized use, consistent with federal and state requirements, may result in disapproval of [the HHS] deeming application." HHS, Health Resources and Services Administration, Calendar Year 2022 Requirements for [FTCA] Coverage for Health Centers and Their Covered Individuals, https://bit.ly/3xFfinH. ("Deemed health centers must continue to receive funding under . . . § 254b, in order to maintain coverage as a deemed PHS employee."). Moreover, in securing deemed status, "to reduce the risk of adverse outcomes that could result in medical malpractice or other health or health-related litigation," ARcare was required to attest it had "implemented risk management procedures" to "specifically address," *inter alia*, "training in Health Insurance Portability and Accountability Act (HIPAA) and other applicable medical record confidentiality requirements." *Id.* at 10–11. ARcare was also required to attest it had developed, implemented, and documented the completion of an "annual health care risk management training plan for staff members based on identified

areas/activities of highest clinical risk for the health center," including training on "HIPAA medical record confidentiality requirements." *Id.* at 11–12 (emphasis added).

Agency regulations are equally clear. *See* 42 C.F.R. § 51c.110 ("All information as to personal facts and circumstances obtained by the project staff about recipients of services shall be held confidential, and shall not be divulged without the individual's consent. . . .") (emphasis added); *id.* § 51c.303 ("A community health center supported under this subpart must . . . [i]mplement a system for maintaining the confidentiality of patient records in accordance with the requirements of § 51c.110 of subpart A."). So too are guidance materials, which stress that maintenance of patient information is a fundamental health center requirement, providing that health centers "must maintain the confidentiality of patient records, including all information as to personal facts and circumstances obtained by the health center staff about recipients of services" and must have "implemented systems . . . for protecting the confidentiality of patient information and safeguarding this information against loss, destruction, or unauthorized use, consistent with Federal and state requirements." HHS, Health Resources and Services Administration, Health Center Compliance Manual, Ch. 10: Quality Improvement/Assurance, https://bit.ly/3VLlJxr.

## C. The District Court Erred In Distinguishing Apposite Decisions

The district court recognized the "importance of patient confidentiality" and acknowledged—and purportedly endorsed—decisions in which courts determined that deemed health centers' protection of patient information constituted the performance of "related functions." App. 148–49, Add. 6–7, R. Doc. 39 at 6–7. The district court nonetheless erroneously distinguished the cases based on its narrow, treatment-focused misreading of the governing statute. *Id.*

Interpreting § 233(a) in accordance with its plain meaning, the better read is that safeguarding patient information is an "essential" and "critical" component of medical care—in other words, an unquestionably medical or related function within the scope of § 233(a) immunity. *Krandle*, 2024 WL 1075359, at *6, *9 (S.D.N.Y. Mar. 12, 2024) (determining "related functions" "must have a real relationship to the practice of medicine" and concluding health center's "responsibility to secure data from internal and external threats in its capacity as a deemed entity . . . . is essential to the practice of medicine."); *Doe*, 2022 WL 17663520, at *6, *8 (concluding deemed defendants were immune under § 233(a) from a claim premised on an "alleged data breach" in part because "long-standing principles" established privacy of health information is "critical to the delivery of needed medical care."); *but see Ford*, 97 F.4th at 260 ("Appellant's PII was not released as a result of the provision of health care. Appellant's PII was not

inappropriately divulged as a result of Sandhills providing health care to Appellant.").

Moreover, the district court's characterization of the apposite body of case law—involving conduct occurring during the course of medical treatment—is in error. *See* App. 148–49, Add. 6–7, R. Doc. 39 at 6–7. In *Kezer v. Penobscot Cmty Health Center*, the United States District Court for the District of Maine determined that the deemed defendants' access to the plaintiff's confidential mental health records in conducting quality assurance/improvement audits— indisputably occurring outside of direct medical care—related to defendants' performance of medical functions. *Kezer*, 2019 BL 141566, at *8 (concluding that the performance of administrative and operational "quality improvement and quality assurance activities . . . are patently related to the provision of medical services"). There, unlike here, the Government "conced[ed] . . . that the 'maintenance of the confidentiality of [the plaintiff's] mental health medical records constituted a covered medical or related function' under the language of § 233(a)." *Id.* at *6.

Similarly, in *Mele v. Hill Health Ctr.*, the alleged breach of confidentiality occurred when plaintiff's medical information was disclosed to a hospital and a substance abuse foundation—purportedly without consent—while plaintiff was enrolled in a residential drug treatment program as a sentencing alternative to

incarceration. *Mele v. Hill Health Ctr.*, No. 06-cv-00455, 2008 WL 160226, at *1, 3 (D. Conn. Jan. 8, 2008). The facts of *Mele* make clear the disclosure did not occur during "the provision of medical care," App. 149, Add. 7, R. Doc. 39 at 7; instead, the disclosures simply took place while the plaintiff was enrolled in the drug treatment program. 2008 WL 160226, at *3 (holding deemed defendants were immune from claim arising from alleged improper disclosure of plaintiff's "medical information to a hospital and a substance abuse foundation" because claim concerned "the related function of ensuring the privacy of patient medical information"). Notably, the named defendants in *Mele* included both a case manager and the program's director. Complaint at 1, 2, *id.*, ECF No. 2 (filed Mar. 23, 2006).

Simply put, ARcare was deemed to be a PHS employee with respect to Plaintiffs' action, which alleges ARcare's performance—or failure to perform— functions essential to its required healthcare services. Nothing more is required for immunity to apply.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district courts denial of ARcare's absolute immunity and remand with instructions to substitute the United States as the sole proper defendant in ARcare's place.

Dated:  July 4, 2024                    Respectfully submitted,

                                        s/ *Matthew Sidney Freedus*
                                        Matthew Sidney Freedus
                                        Rosie Dawn Griffin
                                        **FELDESMAN LEIFER LLP**
                                        1129 20th St. N.W., Suite 400
                                        Washington, DC 20036
                                        202.466.8960
                                        mfreedus@feldesman.com
                                        rgriffin@feldesman.com

                                        Scott A. Irby
                                        Gary D. Marts, Jr.
                                        **WRIGHT, LINDSEY & JENNINGS LLP**
                                        200 West Capitol Avenue, Suite 2300
                                        Little Rock, AR 72201
                                        501.371.0808
                                        gmarts@wlj.com
                                        sirby@wlj.com

                                        *Counsel for Defendant-Appellant ARcare, Inc.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that Appellant's brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B), the typeface requirements of FRAP 32(a)(5)(A) and the type style requirements of FRAP 32(a)(6), using Microsoft Word, Times New Roman font size 14. The brief contains 11,646 words excluding the parts of the brief exempted by Rule 32(f).

In accordance with Eight Circuit Local Appellate Rule 28A(h), the brief and addendum as electronically filed on July 4, 2024, have been scanned with virus detection program Trend Micro, and no virus was detected.

*s/ Matthew Sidney Freedus*
Matthew Sidney Freedus

## CERTIFICATE OF SERVICE

I certify that, on July 4, 2024, I electronically filed the foregoing brief with

the Eighth Circuit Court of Appeals via the CM/ECF electronic filing system.

*s/ Matthew Sidney Freedus*
Matthew Sidney Freedus

*Counsel for Defendant-Appellant ARcare, Inc.*