No. 24-1726

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

GREG HALE, et al.

*Plaintiffs-Appellees*,

v.

ARCARE, INC.

*Defendant-Appellant.*

*On Appeal from the United States District Court*
*For the Eastern District of Arkansas, No. 22-cv-00117, Hon. Brian S. Miller*

## APPELLANT'S REPLY BRIEF

Matthew Sidney Freedus
Rosie Dawn Griffin
**FELDESMAN LEIFER LLP**
1129 20th Street N.W., Suite 400
Washington, DC 20036
202.466.8960
202.293.8103 (fax)
mfreedus@feldesman.com
rgriffin@feldesman.com

Scott A. Irby
Gary D. Marts, Jr.
**WRIGHT, LINDSEY & JENNINGS LLP**
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
501.371.0808
501.376.9442 (fax)
sirby@wlj.com
gmarts@wlj.com

*Counsel for Defendant-Appellant ARcare, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................2

   I.  Federal Courts Have Authority To Assess § 233 Immunity And Substitute The United States As A Defendant Over Its Objection .................2

   II.  Section 233(a) Unambiguously Immunizes ARcare from Plaintiffs' Action.................................................................................................5

      A.  ARcare Is Immune From Plaintiffs' Claims For Its Performance Of Functions "Related" To Medical Functions ...............................5

          1.  The Fourth Circuit Erred in Applying Interpretive Canons To Limit "Related Functions" To "Fields Of Health Care" ......................8

          2.  The Authorities On Which *Ford* Relies Do Not Support Its Narrowing of PHS Act Immunity .......................................................15

          3.  The Additional Authorities Cited Do Not Support Construing "Related Functions" Against Its Literal Meaning.............................19

      B.  Maintaining and Protecting Patient Confidentiality is a Critical Health Center Function Related to Core Medical Functions ..............................23

CONCLUSION ....................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agyin v. Razmzan*, 986 F.3d 168, 177 (2d Cir. 2021) .............................................19

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008)...................................................................................10, 11

*Almendarez–Torres v. United States*,
523 U.S. 224 (1998)...........................................................................................18

*Bennett v. United States*,
375 F. Supp. 3d 1180 (W.D. Wash. Mar. 22, 2019)..........................................13

*Bethea v. Levi Strauss & Co.*,
No. 89-cv-2055, 1990 WL 751028 (8th Cir. Oct. 11, 1990)................................3

*Blumberger v. Tilley*,
No. 22-56032, __ F.4th __, 2024 WL 4113840 (9th Cir. Sept. 9,
2024) ...........................................................................................................19, 25

*Brignac v. United States*,
239 F. Supp. 3d 1367 (N.D. Ga. 2017).................................................................7

*Cir. City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)..........................................................................9, 15, 16, 22

*CSX Transp., Inc. v. Ala. Dept. of Revenue*,
562 U.S. 277 (2011)...........................................................................................10

*Cuoco v. Moritsugu*,
222 F.3d 99 (2d Cir. 2000) .........................................................................*passim*

*El Paso Nat. Gas Co. v. Neztsosie*,
526 U.S. 473 (1999)..............................................................................................3

*Fischer v. United States*,
144 S. Ct. 2176 (2024)...............................................................................7, 8, 20

iii

*Ford v. Sandhills Medical Foundation, Inc.*,
  97 F.4th 252 (4th Cir. 2024) ........................................................*passim*

*Friedenberg v. Lane County*,
  68 F.4th 1113 (9th Cir. 2023) ......................................................*passim*

*Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ..................................9

*Harrington v. Purdue Pharma L.P.*,
  144 S. Ct. 2071 (2024)..........................................................10, 19, 20

*Hui v. Castaneda*,
  559 U.S. 799 (2010)..................................................................*passim*

*Krandle v. Refuah Health Ctr., Inc.*,
  No. 22-cv-4977, 2024 WL 1075359 (S.D.N.Y. Mar. 12, 2024) ...............*passim*

*Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n*,
  499 U.S. 117 (1991)........................................................................23

*Preservation Coalition, Inc. v. Pierce*,
  667 F.2d 851 (9th Cir. 1982) ............................................................3

*Southwest Airlines Co. v. Saxon*,
  596 U.S. 450 (2022)........................................................................12

*United States v. Powell*,
  423 U.S. 87 (1975)....................................................................11, 12

*United States v. Rodgers*,
  466 U.S. 475 (1984)....................................................................1, 12

*Yates v. United States*,
  574 U.S. 528 (2015)..................................................................*passim*

**Statutes**

9 U.S.C. § 1 ....................................................................................15

18 U.S.C. § 1512(c) ........................................................................20

42 U.S.C. § 233(a) ..................................................................*passim*

42 U.S.C. § 233(g)(1)(A)................................................................19

42 U.S.C. § 233(g)(1)(D) ...........................................................25

42 U.S.C. § 233(g)(5)(B) ...........................................................14

42 U.S.C. § 233(h)(1).............................................................22, 25

42 U.S.C. § 254b(k)(3)(C) .........................................................22

50 U.S.C. § 1806(f)...............................................................17, 18

Ark. Code Ann. § 12-18-402 ......................................................24

Emergency Health Personnel Act of 1970, Pub. L. No. 91-623, 84
    Stat. 1870 (Dec. 31, 1970) ...............................................18, 21

Federally Supported Health Centers Assistance Act of 1995, Pub. L.
    No. 104-73, 109 Stat. 780 (Dec. 26, 1995)...........................14

**Legislative Materials**

H.R. Rep. No. 104-398, 104th Cong., 1st Sess. (1995), *reprinted in*
    1995 U.S.C.C.A.N. 767 ........................................................21

**Other Authorities**

A. Robeznieks, *Cybersafety is patient safety—and it's everyone's job*,
    Amer. Med. Ass'n., (May 15, 2024), https://www.ama-
    assn.org/practice-management/sustainability/cybersafety-patient-
    safety-and-it-s-everyone-s-job ...........................................26

2A Norman J. Singer & Shambie Singer, Sutherland Statutory Constr.
    § 47:16 (7th ed. 2023) .....................................................9, 10

16AA Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris.
    § 3975.1 (5th ed. 2024).........................................................4

Fed. R. App. P. 29 ......................................................................4

*Function*, Mosby's Medical Dictionary (11th ed. 2022) .......................13

HHS, 405(d) Program,
    https://405d.hhs.gov/.........................................................26

HHS, Health Resources and Services Administration, *Calendar Year 2024 Requirements for Federal Tort Claims Act Coverage for Health Centers and Their Covered Individuals,* https://bphc.hrsa.gov/sites/default/files/bphc/compliance/pal-2023-01.pdf ................................................................................................26

*Medicine*, Mosby's Medical Dictionary (11th ed. 2022)........................................14

**INTRODUCTION**

ARcare is immune from Plaintiffs' suit: it was deemed by the Secretary of the United States Department of Health and Human Services (HHS) to be a Public Health Service (PHS) employee pursuant to 42 U.S.C. § 233(g) and (h), and its conduct in protecting and maintaining its patients' confidentiality involved "medical . . . or related functions" within the meaning of 42 U.S.C. § 233(a). As Plaintiffs concede, there is an undeniably close connection between a health center's medical functions and its efforts to protect its patients' information. Yet Plaintiffs—supported by the United States as amicus—nonetheless urge this Court to uphold the district court's imposition of temporal and treatment-based limits on § 233(a) immunity, narrowing the statute's coverage to only those suits alleging "conduct that occurred during the course of medical treatment within the context of the provider-patient relationship." App. 148–49, Add. 6–7, R. Doc. 39 at 6–7.

"Resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress." *United States v. Rodgers*, 466 U.S. 475, 484 (1984). In § 233(a), Congress, in "plain text" provided an immunity right to PHS employees that "plainly encompasses damages stemming from the performance of medical and 'related' functions." *Friedenberg v. Lane County*, 68 F.4th 1113, 1128 (9th Cir. 2023); *Hui v. Castaneda*, 559 U.S. 799, 806 (2010) (holding § 233(a) provides "comprehensive" immunity). PHS Act immunity "does not depend on

1

whether the [plaintiff's] claim is framed as one of medical malpractice."
*Friedenberg*, 68 F.4th at 1128. Indeed, the key text "clearly shows that immunity is
not tied to whether the tort transpired in caring for the patient," *id.* at 1127, and the
overall structure and purpose of the PHS Act, as amended by the Federally
Supported Health Centers Assistance Act (FSHCAA), point in the same direction.

Plaintiffs' and the United States' opposition to a commonsense interpretation
of "related functions" can be reduced to four words: follow the Fourth Circuit. But
the relevant Fourth Circuit decision, *Ford v. Sandhills Medical Foundation, Inc.*,
97 F.4th 252 (4th Cir. 2024), is the result of a formalistic application of two
limiting canons of construction that have no place in interpreting § 233(a). *Ford*'s
interpretive missteps should not influence this Court. Broad as it may be, the
phrase "related functions" is unambiguous, and enforcing Congress' words, as
written, furthers the PHS Act's purpose: ensuring PHS employees devote their
time, energy, and resources to advancing public health and serving medically
underserved areas and communities.

## ARGUMENT

### I. Federal Courts Have Authority To Assess § 233 Immunity And Substitute The United States As A Defendant Over Its Objection

As a threshold issue, this appeal asks the Court to analyze the meaning of
§ 233(a) and assess whether it immunizes ARcare from Plaintiffs' action.
Appellant's Opening Brief (hereinafter "ARcare Br.") at 1–2. Amicus United

States—attempting to participate as more than a mere friend to the Court—not only urges the Court to reach a conclusion that directly impacts its pecuniary interests, but also impermissibly presents a question of its own: "[w]hether the district court erred in stating in dicta that, had it found that ARcare was immune under § 233(a), it had authority to substitute the United States as the defendant. Brief for the United States as Amicus Curiae in Support of Appellees (hereinafter "U.S. Br.") at 2. The question is outside the scope of this appeal and, at any rate, is easily answered with a simple "no."

The issue of the district court's authority to substitute the United States is not properly before the Court. The United States has not sought to intervene here, did not do so below, and even in presenting its issue, acknowledges the district court's decision on that point is "dicta." U.S. Br. at 7–8. Absent "exceptional circumstances," only "the party appealing is entitled to frame the issues" appealed. *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 861–62 (9th Cir. 1982); *accord Bethea v. Levi Strauss & Co.*, No. 89-cv-2055, 1990 WL 751028, at *3 (8th Cir. Oct. 11, 1990). As to non-appealing parties, the Supreme Court has long recognized the "inveterate and certain" principle that "[a]bsent a cross-appeal, an appellee . . . may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) (citations and quotation marks omitted).

Recognized "as early as 1796," the rule is an unqualified limit on the power of appellate courts. *Id.* at 479–80. Amicus participation is more limited still. Amici may not raise issues the parties have not appealed, even issues the district court decided. 16AA Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3975.1 (5th ed. 2024); *see also id.* § 3902.1 (reciting "basic rule that a nonparty cannot appeal the judgment in an action between others seems obviously sensible"). The amicus, in short, does not become a party to the appeal and enjoys no rights other than those provided in Fed. R. App. P. 29. *Id.* § 3975.1.

Should this Court nonetheless entertain the United States' asserted issue, the contention the Government "can[] pick and choose when it wishes to be substituted as [a] defendant" is without merit. App. 145, Add. 3, R. Doc. 39 at 3. "Courts repeatedly have rejected the argument that they lack authority to assess immunity under § 233 and substitute the United States as a defendant over its objection." *Moretti v. Letty Owings Ctr.*, No. 21-cv-1525, 2023 WL 6216279, at *5 (D. Or. Sept. 25, 2023) (collecting cases); *accord* App. 145, Add. 3, R. Doc. 39 at 3. And for good reason: it is evident from statutory text and well-established—including by the Supreme Court—that 42 U.S.C. § 233(a) authorizes the relief sought. *See, e.g.*, *Hui*, 559 U.S. at 811 ("the procedure authorized by § 2679(d) is not necessary to effect substitution of the United States").

## II. Section 233(a) Unambiguously Immunizes ARcare From Plaintiffs' Action

The Court should conclude that ARcare performed "related functions" within the meaning of § 233(a) when it undertook—or, as alleged, failed to adequately undertake—activities to protect and maintain the confidentiality of its patients' information. The parties appear to agree that an assessment of ARcare's asserted immunity from Plaintiffs' action depends on first construing the key statutory phrase—"medical, surgical, dental, or related functions"—and then determining whether the conduct from which Plaintiffs' claims arose fits within the statute's protection. In answering the first question, Plaintiffs, supported by the United States, construe § 233(a) against its text, rendering "related functions" superfluous; as to the second question, neither Plaintiffs nor the United States offer a compelling argument that the protection of patient confidentiality is *not* related to ARcare's medical functions. Indeed, Plaintiffs concede the point. Pl. Br. at 23–24.

### A. ARcare Is Immune From Plaintiffs' Claims For Its Performance Of Functions "Related" To Medical Functions

Contrary to the district court's holding, § 233(a) immunizes PHS personnel from actions arising from their performance of functions related to medical functions, including the functions at the heart of plaintiffs' action. This Court should construe § 233(a) as the Ninth and Second Circuits have: to protect PHS employees from suits resulting from their "performance of medical, surgical,

dental, or related functions," § 233(a), rather than merely from suits alleging what is "commonly known as medical malpractice." U.S. Br. at 11.

In *Friedenberg*, the Ninth Circuit, considering the issue "as one of first impression in [that] circuit," held the relevant "statutory language clearly shows that immunity is not tied to whether the tort transpired in caring for the patient." *Friedenberg*, 68 F.4th at 1127. There, as here, the plaintiffs had argued not only that FSHCAA "limits protection for deemed PHS employees to claims where 'the tortious conduct occurs during services provided to patients'" but also, correspondingly, "that § 233 was enacted to cover only medical malpractice claims." *Id.* The Ninth Circuit squarely rejected both arguments, observing that "[w]hile Congress's concerns regarding malpractice insurance premiums were the driving force behind the legislation, Congress did not limit § 233 immunity to 'only' malpractice claims when it could have." *Id.* at 1127 n.7. In *Friedenberg*, the Ninth Circuit considered and endorsed the Second Circuit's decision in *Cuoco v. Moritsugu*, 222 F.3d 99, 108 (2d Cir. 2000), and decisions of district courts in the First, Second, and Fourth circuits. *Friedenberg*, 68 F.4th at 1127–28 (collecting cases).

In *Cuoco*, the Second Circuit examined the "plain meaning" of § 233(a) as applied to an action alleging two PHS officials—Barraco and Moritsugu—were deliberately indifferent to a federal prison inmate's medical needs. *Cuoco*, 222

F.3d at 99.[1] Section 233(a), as the Second Circuit explained, "in effect insures designated public health officials . . . when they are sued for the performance of their medical duties" in *any* civil action or proceeding. *Id.* at 107–08; *see also Brignac v. United States*, 239 F. Supp. 3d 1367, 1376 (N.D. Ga. 2017) (explaining *Cuoco* rejected "proposition that § 233(a) applies *only* to medical malpractice suits or that immunity in turn only extends to medical employees in malpractice cases") (internal citations omitted). As the U.S. District Court for the Southern District of New York observed in *Krandle v. Refuah Health Ctr., Inc.*, the diagnosis and treatment allegations at issue in *Cuoco*—which the Second Circuit viewed as "the heartland of medical functions"—made it a straightforward case. *Krandle*, No. 22-cv-4977, 2024 WL 1075359, at *4 (S.D.N.Y. Mar. 12, 2024). This was so even though defendant "Moritsugu's alleged misdeeds related only to his decision, as the principal medical official for the Bureau of Prisons, not to authorize a particular medical treatment for Cuoco." *Id.* (quoting *Cuoco*, 222 F.3d at 109).

The decisions align with the maxim that to avoid rendering Congress' chosen words superfluous and undermining statutory purpose, courts consider both "specific context" and "the broader context of the statute as a whole" and "must 'give effect, if possible, to every clause and word of [the] statute.'" *Fischer v.*

---

[1] *Cuoco* involved the constitutional claims of a preoperative transgendered individual who sought to receive estrogen treatments while detained in a federal prison facility. *Id.* at 103.

*United States*, 144 S. Ct. 2176, 2183 (2024) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000) and *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). No authority on which Plaintiffs and the United States rely offers a compelling reason to depart from a literal reading of § 233(a).

### 1. The Fourth Circuit Erred in Applying Interpretive Canons To Limit "Related Functions" To "Fields Of Health Care"

Plaintiffs and the United States give *Friedenberg* and *Cuoco* scant attention, urging this Court to instead follow *Ford v. Sandhills Medical Foundation, Inc.*, 97 F.4th 252 (4th Cir. 2024). Appellee's Brief (hereinafter "Pl. Br.") at 7; U.S. Br. at 8.[2] There, the Fourth Circuit—in direct conflict with *Friedenberg*—significantly narrowed § 233(a) immunity, interpreting the statute as immunizing only PHS employees' "performance of the provision of health care." *Ford*, 97 F.4th at 260. This unnatural construction reduces the "comprehensive" immunity at issue to mere medical malpractice coverage, permitting its application only where a plaintiff is "injured by any health care provided by [a PHS employee]." *Compare id.* at 261 *with Hui*, 559 U.S. at 806 (recognizing "broad" language in § 233(a) confers a "comprehensive immunity" right). Although the *Ford* court cites *Friedenberg* for the truism that FSHCAA extends PHS Act immunity to federally

---

[2] The United States also leans into *Ford*'s conflation of the Federal Tort Claims Act's remedy with the immunity right at issue. *See, e.g.*, U.S. Br. at 19. As explicated in ARcare's opening brief, the scope of the FTCA's remedy is distinct from the reach of PHS Act immunity. *See* ARcare Br. at 20–23.

funded health centers, *Ford*, 97 F.4th at 257, the court does not reconcile its decision with the Ninth Circuit's clearly contrary holding. The Second Circuit's decision in *Cuoco* receives worse than the silent treatment—the *Ford* court implies *Cuoco*'s holding limited immunity to actions based on conduct undertaken "in [a health center's] capacity as a doctor responsible for, [or] in the course of rendering medical treatment." *Id.* at 260. *Cuoco* in no way suggested that § 233(a) immunity is limited to "doctor[s] responsible for treatment" or to actions arising from "rendering medical treatment." *Krandle*, 2024 WL 1075359, at *4.

The Fourth Circuit's error in construing § 233(a) to impose both temporal and treatment-based limits on immunity stems from a misapplication of two closely related canons of construction, *noscitur a sociis* and *ejusdem generis*. *Ford*, 97 F.4th at 259–60 (citing *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) and *Yates v. United States*, 574 U.S. 528, 544 (2015) (plurality opinion)). The former is a "commonsense canon" that "counsels that a word is given more precise content by the neighboring words with which it is associated." 2A Norman J. Singer & Shambie Singer, Sutherland Statutory Constr. § 47:16 (7th ed. 2023). Its application "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates*, 574 U.S. at 543 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). The latter canon, *ejusdem generis*—meaning literally "of

the same kind"—is properly applied to statutes in which Congress has chosen to list specific terms followed by a general "catchall" or "residual" term, which both includes the specific terms and reaches more broadly, including items similar in kind to those specifically listed. Singer & Singer, *supra*, § 47:17.[3]

The canons are applied *against* a literal reading of the general phrase, narrowing its reach when necessary to give meaning to each surrounding word used and to avoid superfluity. *CSX Transp., Inc. v. Ala. Dept. of Revenue*, 562 U.S. 277, 295 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless."). "So, for example, when a statute sets out a list discussing 'cars, trucks, motorcycles, or any other vehicles,' . . . the catchall phrase may reach similar landbound vehicles (perhaps including buses and camper vans), but it does not reach dissimilar 'vehicles' (such as airplanes and submarines)." *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2082–83 (2024) (citing *McBoyle v. United States*, 283 U.S. 25, 26–27 (1931)). Where appropriate, courts proceed on the inference that Congress, in supplying a list of specific items followed by a "catchall" phrase, was "focused on [a] common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 224–25 (2008) (citing *United States v. Aguilar*, 515 U.S. 593, 615 (1995)

---

[3] A listed word is "specific" when it falls within the ordinary meaning of another word with which it is associated in the same text. *Id.*

(Scalia, J., concurring in part and dissenting in part)).

The Fourth Circuit's application of the canons in *Ford* to limit "related functions" to functions within related "fields of health care," 97 F.4th at 259, illustrates the danger of a formalistic application of the interpretive guides. However well established, each canon is, at most, "only an instrumentality for ascertaining the correct meaning of words when there is uncertainty." *United States v. Powell*, 423 U.S. 87, 91, (1975). Accordingly, courts must not "woodenly apply limiting principles every time Congress includes a specific example along with a general phrase." *Ali*, 552 U.S. at 227 (citation omitted). The Fourth Circuit's misstep in *Ford* is perhaps best summed up in its own acknowledgement that after both "employing the canons of construction and considering the plain meaning of the words in § 233(a), we discern no ambiguity in the phrase 'related functions.'" *Ford*, 97 F.4th at 260.

First, a careful examination of the structure of § 233(a)—in relevant context—against the structure of the statutory language evaluated in the cases on which *Ford* relied demonstrates that Congress did not draft the relevant portion of § 233(a) in a manner inviting application of either canon to ascertain uncertain meaning. Aside from having a "plain meaning," *Cuoco*, 222 F.3d at 108, the list of "functions" in § 233(a) simply does not follow the syntactic format the canons aid in interpreting: a list of specific nouns followed by a catchall noun that includes the

specific items and others of like kind. *Cf. Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 454, 463 (2022) (construing statute's exemption of "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce"); *Powell*, 423 U.S. at 319 (analyzing statute proscribing mailing of "pistols, revolvers, and other firearms capable of being concealed on the person").

Rather than a list of specific nouns followed by a general, "catchall" noun or noun phrase, § 233(a) provides a disjunctive list of four categorical adjectives—"medical, surgical, dental, or related"—each of which modifies the broad, general noun—"functions"—that follows. *See Rodgers*, 466 U.S. at 480 (rejecting "narrow, technical definition" of statutory term when it "clashes strongly" with "sweeping" language in same sentence). The fourth adjective, "related," does some extra work: it both conveys a fourth category of functions for which PHS employees are immunized and defines itself by relation to the three preceding categories of functions.

Properly read within the context of § 233(a), "related" does not serve as a "catchall" that includes the preceding three adjectives. It is a broad category of functions onto itself, which does not house within it the prior three "function" categories. A medical function, in other words, is not a "related" function any more than a medical function is a surgical function. As explained in ARcare's principal brief, "related" connotes connection, not similarity. ARcare's Br. at 24, 26–27, 31;

12

*see Krandle*, 2024 WL 1075359, at *10 ("[W]hat matters is the substantive connection."). Had Congress wanted to capture functions in health care fields *similar* to medical, dental, and surgical functions—whatever those might be—it could have employed that very phrase in the statute, but did not. 42 U.S.C. § 233(a); *see Bennett v. United States*, 375 F. Supp. 3d 1180, 1187 (W.D. Wash. Mar. 22, 2019) (rejecting United States' "overly restrictive view on the coverage of § 233(a)" that "'related function' should be construed to only embrace subjects similar in nature to those enumerated by the specific terms that preceded it").

Second, the Fourth Circuit's transformation of "related functions" to mean "fields of health care" demonstrates the canons' awkward result. "Fields," a term the Fourth Circuit does not define, is certainly not synonymous with functions. A "function" is an "activity" or "purpose natural to or intended for a person or thing." *Krandle v. Refuah Health Ctr., Inc.*, No. 22-cv-4977, 2024 WL 1075359, at *5 (S.D.N.Y. Mar. 12, 2024) (quoting Oxford English Dictionary (3d Ed. 2001)). In medical terminology, a function is "an act, process, or series of processes that serve a purpose." *Function*, Mosby's Medical Dictionary at 738 (11th ed. 2022). A "field" of health care, which appears nowhere in § 233(a), is both more narrow and more broad, as demonstrated by its inclusion in the 1995 FSHCAA amendments, where it expands the definition of part-time, contract-providers qualifying as deemed PHS employees to include a "provider of services in the *fields of* family

practice, general internal medicine, general pediatrics, or obstetrics and gynecology." Federally Supported Health Centers Assistance Act of 1995, § 8, Pub. L. No. 104-73, 109 Stat. 780 (Dec. 26, 1995), *codified at* 42 U.S.C. § 233(g)(5)(B).

Neither the Fourth Circuit, nor Plaintiffs, nor the United States can convincingly identify what might constitute a "related function" if such functions really mean functions within fields of health care that are not medical, surgical, or dental. The United States' attempt to identify such fields underscores the unworkability of the Fourth Circuit's definition. The assertion, U.S. Br. at 10, that nursing, radiology, or physical therapy are merely *related* to medical, surgical, or dental functions strains credulity. Certainly a perioperative registered nurse would be surprised to learn he does not perform surgical functions in his professional capacity. Equally shocked would be the radiologist who, after completing medical school and residency, comes to learn her job does not entail performance of medical functions. As for physical therapy, medical dictionary definitions easily refute the United States' categorization: "medical" is defined simply by cross-reference to "medicine," itself defined in part by its "major divisions"—academic and clinical—and its "kinds" which explicitly "include . . . physical medicine and rehabilitation." *Cf. Medicine*, Mosby's Medical Dictionary at 1119. Further undercutting the United States' categorization: in Plaintiffs' refreshingly sound

estimation, "physical therapists, nurses, nurse practitioners, oral hygienists, etc."

do, in fact, perform medical, surgical, and/or dental functions. Pl. Br. at 11 n.6.

### 2. The Authorities On Which *Ford* Relies Do Not Support Its Narrowing of PHS Act Immunity

The *Ford* court cites three authorities as supporting its conclusion that "the

language 'related functions' acts as a general catchall for . . . the performance of

medical, surgical, [or] dental' functions." *Ford*, 97 F.4th at 261. None analyze

statutory language remotely similar to the relevant portion of § 233(a). First, in

*Circuit City*, the Supreme Court interpreted 9 U.S.C. § 1, which exempts from the

Federal Arbitration Act's coverage the "contracts of employment of seamen,

railroad employees, *or any other class of workers* engaged in foreign or interstate

commerce." *Circuit City*, 532 U.S. at 112, 114–15.

112 (emphasis added). Second, in *Yates*, a case involving the destruction of

undersized fish in a commercial catch, the Sarbanes-Oxley Act's imposition of

penalties on anyone who "knowingly alters, destroys, mutilates, conceals, covers

up, falsifies, or makes a false entry *in any record, document, or tangible object*

with the intent to impede, obstruct, or influence" was at issue. *Yates*, 574 U.S. at

528 (emphasis added).[4]

---

[4] As Justice Alito noted in concurrence, the language at issue in *Yates* presented "an imperfect *ejusdem generis* case because 'record' and 'document' are themselves quite general." *Yates*, 574 U.S. at 550 (Alito, J., concurring).

Both *Circuit City* and *Yates* concern statutes in which Congress provided a list of specific nouns—seamen and railroad employees, records and documents—followed by a more general noun: class of workers, tangible object. In each, the general noun can fairly be construed to include the preceding, specific nouns: seamen and railroad employees are classes of workers; documents and records are, of course, tangible objects. *Cir. City*, 532 U.S. at 138; *Yates*, 574 U.S. at 550. To limit the general nouns to something narrower than *all* classes of workers and *all* tangible objects, which would have resulted in superfluity and conflicted with purpose, the Supreme Court carefully analyzed surrounding text.

In *Circuit City*, the full general phrase under consideration exempted from enforced arbitration the employment contracts of "any other class of workers engaged in foreign or interstate commerce." *Cir. City*, 532 U.S. at 112. The court construed the general phrase's coverage against the preceding specific classes of workers to narrow the provision from applying to virtually all employment contracts, because such a reading would have "failed to give independent effect to the statutes' enumeration of the specific categories of workers which precedes it." *Id.* at 111. Statutory purpose also played a role: sweeping the employment contracts of such a broad swath of workers out of the Act's scope would have significantly undermined the enforcement of arbitration agreements in federal courts, under a law enacted in "response to hostility of American courts to the

enforcement of arbitration agreements." *Id.* at 111, 118–19.

In *Yates*, the plurality construed "tangible object" with reference to nearby text setting forth the actions Congress criminalized when done to documents, records, and tangible objects: altering, destroying, mutilating, concealing, covering up, falsifying, or making a false entry in. *Yates*, 574 U.S. at 550–52. The Supreme Court concluded that the final two verbs, "'falsif[y]' and 'mak[e] a false entry in,' typically take as grammatical objects records, documents, or things used to record or preserve information, such as logbooks or hard drives." *Id.* at 529; *see also id.* at 551 ("[F]ocusing on the verbs, the category of nouns appears to be filekeeping.") (Alito, J., concurring). Bolstering this construction was the fact that reading "tangible object" in § 1519 of that Act to mean "any and every physical object" would make another distinct section of Sarbanes-Oxley entirely surplus. *Id.* at 542.

Finally, in *Wikimedia Found. v. National Security Agency*, the third case on which the *Ford* panel relied in interpreting "related functions," the Fourth Circuit construed 50 U.S.C. § 1806(f), which describes three conditions that trigger a district court's *in camera* and *ex parte* review obligations under the Foreign Intelligence Surveillance Act (FISA). *Wikimedia*, 14 F.4th 276, 295 (4th Cir. 2021). As in *Circuit City* and *Yates*, the statute at issue in *Wikimedia* included specific items—there, triggering conditions—followed by a more general condition ("any motion or request . . . pursuant to any other statute or rule"), which context

and purpose indicated should be read as narrowed by the preceding items. *Wikimedia*, 14 F.4th at 295, 297 ("In short, the third condition in § 1806(f) is confined to procedural requests related to . . . the government's FISA documentation and the resulting intelligence[]. This corresponds with interpreting § 1806(f) . . . not as an unbounded invitation for litigants to acquire any information they desire about the government's intelligence programs.").

In contrast with *Circuit City*, *Yates*, and *Wikimedia*, here, construing "related functions" to mean what it says—*i.e.*, functions related to PHS employees' medical functions, surgical functions, or dental functions—presents no superfluity problem and is consonant, rather than inconsistent, with accompanying words and the statute's broader structure. *See Friedenberg*, 68 F.4th at 1127; *Krandle*, 2024 WL 1075359, at *4; *see also, e.g.,* ARcare Br. at 24–29. Clearly indicating that Congress intended PHS employees' immunity reach beyond malpractice claims, § 233(a), on enactment, was entitled "Defense of Certain Malpractice *and Negligence Suits*." Emergency Health Personnel Act of 1970, § 4, Pub. L. No. 91-623, 84 Stat. 1870 (Dec. 31, 1970) (emphasis added); *see Almendarez–Torres v. United States,* 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (internal quotation marks omitted); *accord Yates*, 574 U.S. at 540. In FSHCAA, Congress did not alter the breadth of existing PHS Act immunity,

18

instead affording health centers and their personnel every ounce of it. 42 U.S.C. §

233(g)(1)(A); *Blumberger v. Tilley*, No. 22-56032, __ F.4th __, 2024 WL

4113840, at *2 (9th Cir. Sept. 9, 2024) ("The immunity for deemed PHS

employees is identical to the immunity for true PHS employees"); *Agyin v.

Razmzan*, 986 F.3d 168, 177 (2d Cir. 2021) (same).

### 3. The Additional Authorities Cited Do Not Support Construing "Related Functions" Against Its Literal Meaning

Finally, the additional authorities offered by Plaintiff and the United States

counsel against the atextual construction for which each nonetheless advocates. In

urging this Court that *ejusdem generis* should limit its read of "related functions,"

the United States cites *Harrington v. Purdue Pharma*. U.S. Br. at 17. The case

undermines, rather than supports, the government's argument. In *Harrington*, the

Supreme Court considered a list of six permissible provisions "a debtor may

include and a Court may approve" in a Chapter 11 reorganization plan.

*Harrington*, 144 S. Ct. at 2081–82. Five of the listed provisions are specific,

followed by a final, enumerated item allowing plans to include "any other

appropriate provision not inconsistent with the applicable provisions of this title."

*Id.* The statute's structure indicates Congress included this final listed item "tacked

on at the end" to serve as a "catchall phrase" that "operates to confer additional

authorities on a bankruptcy court" in a manner consistent with the preceding list.

*Id.* (concluding use of "context dependent" language, including phrase "any *other*

appropriate provision" indicates a catchall phrase contextualized by preceding list).

Plaintiffs' citation to *Fischer v. United States* is likewise unavailing. Pl. Br. at 11. There, the Supreme Court considered whether the "residual 'otherwise' clause in Section 1512(c)(2)" of the Sarbanes-Oxley Act reached a criminal defendant's alleged participation in the January 6, 2021 attack on the United States Capitol. *Fischer*, 144 S. Ct. at 2182–83. The provision at issue first criminalizes a list of similar, specific acts—altering, destroying, mutilating, or concealing a record, document, or other object—done with an intent to impair the object's integrity or availability for use in an official proceeding. 18 U.S.C. § 1512(c). The residual clause that follows further subjects anyone who "corruptly. . . otherwise obstructs, influences, or impedes any official proceeding" to criminal penalty. *Id.* Relying on the statute's purpose and the broader context of the criminal code, the *Fischer* majority concluded that Congress drafted the residual clause, like the clause before it, to criminalize only acts undertaken to impair evidence, as a broader reading would render superfluous both the specific examples, and also "numerous provisions" of obstruction law located elsewhere in the federal criminal code. *Fischer*, 144 S. Ct. at 2186–87. Informing this interpretation was the parties' agreement that the provision at issue was "prompted in the first place" to reach "document shredding and similar scenarios." *Id.* at 2186.

*Harrington* and *Fischer* teach that courts properly apply limiting canons to

read statutory language *against* its literal meaning when doing so furthers the statute's purpose. Conversely, where, as here, the literal meaning of relevant statutory language is consistent with the act's structure and purpose, courts need not—and should not—construe the text to mean anything other than what it says. In enacting § 233(a), Congress, in "broad" language, provided PHS employees a "comprehensive" immunity right, *Hui*, 599 U.S. at 806, in part to "encourage health personnel to practice in areas where shortages of . . . personnel exist." Pub. L. No. 91-623 (addressing "areas with critical medical manpower shortages"). When Congress, in 1992 and 1995, extended "the same" immunity to health centers and their personnel, it was similarly focused on obviating the expense of private insurance premiums by broadly immunizing their official conduct. *See* H.R. Rep. No. 104-398, 104th Cong., 1st Sess. (1995) at 6, 7 (1995), *reprinted in* 1995 U.S.C.C.A.N. 767, 769. (observing 1992 FSHCAA demonstration "program has yielded significant savings for participating health centers," allowing funds to be "redirected to patient care"); *Friedenberg*, 68 F.4th at 1127.

Confirming that "related functions" does not mean functions within related "fields of health care," Congress, in 1992 and again in 1995, gave no indication that health center immunity would be limited to malpractice claims. "While Congress's concerns regarding malpractice insurance premiums were the driving force behind the legislation, Congress did not limit § 233 immunity to 'only'

malpractice claims when it could have." *Cuoco*, 222 F.3d at 108 (noting "there is nothing in the language of § 233(a) to support [the] conclusion" that immunity is limited to medical malpractice suits). Indeed, FSHCAA's many references to "malpractice"—seized on by Plaintiffs and the United States as cutting against a commonsense reading of "related functions"—instead demonstrate Congress' familiarity with the concept of "malpractice," and highlight its express distinguishment of medical malpractice actions from actions and proceedings based on the "medical . . . and related" conduct § 233(a) immunizes. Underscoring this natural reading, § 233(h)(1) provides that a health center, to qualify as a deemed PHS employee, must implement policies "to reduce the risk of malpractice *and the risk of lawsuits arising out of any health or health-related functions* performed by the entity." *Id.* § 233(h)(1) (emphasis added); *see also* 42 U.S.C. § 254b(k)(3)(C) (reflecting direct connection between required "quality improvement" activities and "confidentiality of patient records").

Accordingly, even if the key phrase in § 233(a) did call for the application of the *noscitur a sociis* and *ejusdem generis* canons, a strong "maxim point[s] in a different direction." *Cir. City*, 532 U.S. at 115 ("Canons of construction need not be conclusive."). Narrowing the immunity right solely to actions resulting from "the provision of health care," as Plaintiffs and the United States urge, would undermine the statute's purpose, *see* ARcare Br. at 23–29, and "render the 'related

functions' language in the statute superfluous." *Friedenberg*, 68 F.4th at 1128; *cf.*

*Norfolk and Western Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129

(1991) ("The [*ejusdem generis*] canon does not control, however, when the whole

context dictates a different conclusion."). When the phrase "related functions" is

given its naturally broad meaning, it furthers the statute's purpose by assuring

actual and deemed PHS personnel that they are protected in their performance of

such functions, which undoubtedly evolve over time, just as causes of actions

resulting from them do. *Cf. Hui*, 599 U.S. at 806 (recognizing elasticity of other

phrases in § 233(a)—*i.e.*, "exclusive of any other civil action"—which "easily

accommodates both known and unknown causes of action").

### B. Maintaining And Protecting Patient Confidentiality Is A Critical Health Center Function Related To Core Medical Functions

Maintaining and protecting patient confidentiality is a critical health center

function bearing a close relation to health centers' core medical, surgical, and dental

functions. ARcare Br. at 36–43. Neither Plaintiffs nor the United States seriously

refute the connection between medical functions and the maintenance of patient

confidences. Indeed, Plaintiffs concede that "medical professionals have a duty of

confidentiality that has been a part of the practice of medicine for more than a

century." Pl. Br. at 23 (referencing "the physician-patient relationship in which the

confidentiality of information has been rooted since the 1800s"); *see also id.* at 24

(acknowledging "physicians and other medical professionals have duties of

confidentiality"). Plaintiffs further concede, consistent with their complaint, that the patient information at issue in their suit was "originally submitted to [ARcare] for purposes of gaining health care services." *Id.* at 24.

To avoid the import of those concessions, Plaintiffs—supported by the United States—present a further restriction: for immunity to cover an action, the legal liability at issue must be "unique to medical providers or to those who are engaged in the performance of medical, surgical, dental, or related functions." Pl. Br. at 25; *see also* U.S. Br. at 20. Nothing in the PHS Act indicates its four categories of functions are defined by the exclusion of responsibilities that co-occur in other industries. Instead, courts have repeatedly recognized that cross-cutting functions—like recordkeeping, reporting suspected child abuse, and taking adequate care in hiring and supervision—while not uniquely connected to the performance of medical functions, are nonetheless sufficiently "related" to fall within PHS Act immunity. *See Friedenberg*, 68 F.4th at 1129 (collecting cases); *cf.* Ark. Code Ann. § 12-18-402 (identifying forty-three mandated child abuse reporters, including various medical and non-medical personnel). Moreover, even taking this view, the protection of health information *is* uniquely imposed on ARcare as a recipient of 42 U.S.C. § 254b funding and a HIPAA covered entity, *i.e.*, in its "capacity as a community health center." *Krandle*, 2024 WL 1075359, at *10 ("If someone blurts out sensitive medical information while ordering food at a

restaurant, the server need not safeguard that information."); *see also* ARcare Br. at 43–50.

Finally, and tellingly, both Plaintiffs and the United States ignore ARcare's reliance on the official "application" health centers submit to obtain deemed PHS employment, which on its face contradicts Plaintiffs' argument that protecting patient confidences is "security-related work by information technology and compliance personnel" unrelated to medical functions. Pl. Br. at 20. As required by statute, the application is "prescribe[d]" by the HHS Secretary—who has "expertise in administering healthcare policies and services," *Blumberger*, 2024 WL 4113840, at *10. Like any insurance application requiring information necessary to underwrite a risk—it identifies activities, functions, and risks for which the health center applicant seeks (and needs) coverage. 42 U.S.C. § 233(g)(1)(D), (h)(1). HHS's pointed focus on confidentiality in its deeming application cannot be squared with the district court's conclusion that protecting patient information "from cyberattacks" or other unauthorized access or use is too attenuated from "the provision of medical care" to "render ARcare's failure to protect that information a 'related function' under section 233(a)." App. 149, Add. 7, R. Doc. 39 at 7. The application not only draws a direct connection between medical functions and the protection of patient information, but also expressly ties confidentiality to *care*, identifying compliance with "(HIPAA) and other

applicable medical record confidentiality requirements" as one of the "areas/activities of highest *clinical risk* for the health center." HHS, Health Resources and Services Administration, Calendar Year 2024 Requirements for [FTCA] Coverage for Health Centers and Their Covered Individuals ("Deeming App.") at 11, https://bphc.hrsa.gov/sites/default/files/bphc/compliance/pal-2023-01.pdf (emphasis added).[5] The relationship between clinical functions and "confidentiality and security" is likewise evident in HHS's requirement that health center applicants verify, under penalty of perjury, that they have "annual risk management training plans for all staff . . . based on identified areas/activities of highest clinical risk." Deeming App. at 11, 22. The required staff-wide training to mitigate "clinical risk" explicitly includes "training in [HIPAA] and other applicable medical record confidentiality requirements." *Id.* at 9–11 (requiring health centers provide HHS a copy of their training plans). Finally, HHS views health centers' implementation and maintenance of "systems and procedures for protecting the confidentiality of patient information" as so critical to its decision

---

[5] The Secretary issues a new deeming application each calendar year. The CY 2024 iteration—which postdates the events at issue—illustrates HHS's increasing emphasis on safeguarding patient information. *See also* HHS, 405(d) Program, https://405d.hhs.gov/ (recognizing, as division's motto, "Cyber Safety is Patient Safety"); *see also* A. Robeznieks, *Cybersafety is patient safety—and it's everyone's job*, Amer. Med. Ass'n. (May 15, 2024), https://www.ama-assn.org/practice-management/sustainability/cybersafety-patient-safety-and-it-s-everyone-s-job (quoting "two basic tenets" HHS speaker advanced at global conference: "Cybersafety is patient safety" and "Cybersecurity is everyone's responsibility").

whether to extend deemed PHS employee status, that a failure to do so, and to "safeguard this information against loss, destruction, or unauthorized use" is grounds for denying a health center "deemed" PHS employee status, and thus the absolute immunity protection of § 233(a).

## CONCLUSION

For the foregoing reasons, and those provided in ARcare's principal brief, this Court should reverse the district court's denial of ARcare's absolute immunity and remand with instructions to substitute the United States as the sole proper defendant in ARcare's place.

October 7, 2024                  Respectfully submitted,

                                *s/ Rosie Dawn Griffin*
                                Matthew Sidney Freedus
                                Rosie Dawn Griffin
                                **FELDESMAN LEIFER LLP**
                                1129 20th St. N.W., Suite 400
                                Washington, D.C. 20036
                                202.466.8960
                                mfreedus@feldesman.com
                                rgriffin@feldesman.com

                                Scott A. Irby
                                Gary D. Marts, Jr.
                                **WRIGHT, LINDSEY & JENNINGS LLP**
                                200 West Capitol Avenue, Suite 2300
                                Little Rock, AR 72201
                                501.371.0808
                                gmarts@wlj.com
                                sirby@wlj.com

                                *Counsel for Defendant-Appellant ARcare, Inc.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B), the typeface requirements of FRAP 32(a)(5)(A) and the type style requirements of FRAP 32(a)(6), using Microsoft Word, Times New Roman font size 14. The brief contains 6187 words excluding the parts of the brief exempted by Rule 32(f).

In accordance with Eight Circuit Local Appellate Rule 28A(h), the brief as electronically filed on October 7, 2024, has been scanned with virus detection program Trend Micro, and no virus was detected.

*s/ Rosie Dawn Griffin*
Rosie Dawn Griffin

**CERTIFICATE OF SERVICE**

I certify that, on October 7, 2024 I electronically filed the foregoing brief

with the Eighth Circuit Court of Appeals via CM/ECF electronic filing system.


*s/ Rosie Dawn Griffin*
Rosie Dawn Griffin